## STATE OF CONNECTICUT *v.* VERNON HAYNES
## (SC 20794)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

### *Syllabus*

Convicted of murder in connection with the stabbing death of the victim, the defendant appealed to this court. The trial court had precluded the state from using, in its case-in-chief, a statement given by the defendant to the police on the ground that, although the defendant had given the statement voluntarily, it had been obtained in violation of his right to counsel under *Miranda* v. *Arizona* (384 U.S. 436) and *Edwards* v. *Arizona* (451 U.S. 477). The court nevertheless permitted the state to use the statement to impeach the defendant's trial testimony in accordance with *State* v. *Reid* (193 Conn. 646), in which this court, relying on the United States Supreme Court's decision in *Harris* v. *New York* (401 U.S. 222), held that the Connecticut constitution permits the state to impeach a criminal defendant's trial testimony with a voluntary statement that was obtained in violation of *Miranda*. On appeal, the defendant claimed, inter alia, that this court should overrule *Reid* and conclude that article first, § 8, of the Connecticut constitution precluded the state from using his statement to impeach his trial testimony. *Held*:

Guided by the relevant factors set forth in *State* v. *Geisler* (222 Conn. 672) for construing the Connecticut constitution, as well as stare decisis considerations, this court declined the defendant's request to overrule *Reid* and concluded that the state's use of the defendant's statement for impeachment purposes did not violate the state constitution.

The defendant did not provide inescapable reasons that would compel this court to overrule *Reid*, insofar as the overwhelming weight of authority from other states aligned with Connecticut's existing view of the *Harris* impeachment exception, the defendant failed to establish that the rights of criminal defendants are not adequately protected by the policy articulated in *Harris* and *Reid*, which balances the valuable aid that the impeachment process affords the jury in assessing a defendant's credibility with the deterrent effect on proscribed police conduct that results when a defendant's statement to the police is made unavailable to the prosecution in its case-in-chief, and extending the rule of *Harris* and *Reid* to impeachment evidence would impair the truth seeking process of a criminal trial.

The trial court did not violate the defendant's constitutional rights by admitting certain photographs that the police had taken of the defendant at the time they interrogated him, as the photographs had an independent source in the standard police procedure of photographing arrestees and were

State *v.* Haynes

obtained for reasons unrelated to unlawful police conduct, and, accordingly, the photographs were not fruits of the unlawfully obtained statement by the defendant.

The trial court did not abuse its discretion in allowing the prosecution to present the testimony of a witness who had been disclosed only three days prior to the start of evidence, as the record established that the prosecutor did not believe that he needed the witness' testimony when his initial witness list was prepared, the defendant did not demonstrate any prejudice from the delayed disclosure, and the relevant rule of practice (§ 40-13 (c)) embraces a presumption against precluding a witness' testimony as a sanction for delayed disclosure when the party calling the witness did not in good faith intend to call the witness at the time the party provided its initial witness list.

(*One justice concurring in part and dissenting in part*)

Argued November 6, 2024—officially released July 1, 2025

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Schuman, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*John Cizik*, senior assistant public defender, with whom was *Laila M. G. Haswell*, senior assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, *Don E. Therkildsen, Jr.*, senior assistant state's attorney, and *Alexandra Arroyo*, assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. Following a jury trial, the defendant, Vernon Haynes, was convicted of murder in violation of General Statutes § 53a-54a in connection with the stabbing death of his girlfriend, T.[1] On appeal, the defen-

[1] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

State *v.* Haynes

dant makes three claims. First, the defendant asks us to overrule *State* v. *Reid*, 193 Conn. 646, 654–55 and n.11, 480 A.2d 463 (1984), which held that the Connecticut constitution permits the state to impeach a criminal defendant with a voluntary statement obtained in violation of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Second, the defendant claims that the trial court erred in admitting photographs taken of him during an interview that violated his right to counsel under *Miranda*. Third, the defendant claims that he was deprived of a fair trial when the prosecutor presented testimony from a witness who had been disclosed only three days prior to the start of evidence. We disagree with each of the defendant's claims and affirm the judgment of conviction.

The jury could have reasonably found the following facts. The defendant and the victim were in a romantic relationship and lived together in an apartment in Waterbury with the victim's son, W. On May 12, 2018, while in the victim's bedroom, the defendant stabbed her repeatedly in the neck, shoulders, and chest with scissors, causing her death.[2] After killing the victim, the defendant showered, took the victim's wallet, and drove off in her silver Mitsubishi.

W was at home during the murder, playing video games and listening to music in his room while wearing headphones. Later that day, he discovered bloody towels and a bloody pair of shorts, which he had seen the defendant wearing earlier that day, in the bathroom.

_____

[2] The state's chief medical examiner determined that the cause of the victim's death was "[s]harp injuries of the head, trunk, and neck, with injury of major blood vessels, larynx, and lung," and that the manner of death was homicide. His autopsy report documented the presence of twenty-seven distinct stab wounds, but he testified at trial that the total was "probably close to double that number," due to the overlapping nature of the injuries. Additionally, the victim's nose was broken, she had bruising on her cheek, jaw, and forehead, and a "subarachnoid hemorrhage of her brain, which is an indication of blunt force going through her brain . . . ."

State *v.* Haynes

He then entered the victim's bedroom, where he found the victim lying face down on the bed in a puddle of blood, with her neck sliced open and stab wounds covering her neck, shoulders, and upper back. W called 911 at 3:05 p.m., sobbing: "My mother is dead. . . . She was stabbed to death. . . . The man who was here is gone. . . . There's blood everywhere . . . . She's gone. . . . I know exactly who did it. . . . It was her boyfriend. . . . He's got my mother's car. . . . His phone is off. . . . I don't know where he went." W also called his brother, M.

The police and paramedics arrived several minutes later, pronounced the victim dead, and documented the crime scene. Police officers interviewed W, M, and a neighbor, James Cooper, who had heard screaming coming from the victim's apartment and had later seen the defendant getting into the victim's car and driving away. At trial, Cooper testified that he had heard the victim screaming and yelling, "get the fuck out. Leave me alone. Get the fuck off me."

After identifying the defendant as a suspect and applying for an arrest warrant, the Waterbury police broadcast a description of the victim's Mitsubishi and license plate number over the police radio system. Because the defendant had connections in New York, the police also alerted law enforcement agencies there of the murder. Family members of the victim, including M and the victim's sister-in-law, K, attempted to reach the defendant through Facebook Messenger, asking him for his location and to turn himself in to the police.

The defendant responded to the messages sent by both M and K. To M, he wrote that "he had no option" but to kill the victim, that it was "self-defense" and "an accident," and that he "couldn't control" his actions. He told M that he was on his way to Massachusetts in a van and, from there, would go to Mexico to kill himself.

State *v.* Haynes

To K, he wrote: "I'm almost [out of] the country. . . . [S]he kept attacking me . . . . She went crazy because I would not buy crack for her. She smashed me in the face with a glass football. I did nothing. She stabbed my eardrum with a long pointy comb. I did nothing. She beat on my face with her [fist]. I did nothing but . . . keep ok pushing her away. She took her key and . . . turned it into my spine. I pushed her. She yanked my locks out. I did nothing. . . . I'm fucked up face swollen spine hurting. I can [barely] stand."[3]

Notwithstanding his statements to M and K, the defendant had, in fact, driven to the Bronx, New York, where license plate readers had detected the victim's Mitsubishi, and the Waterbury police had traced his cell phone. Around midnight, Waterbury police detectives provided the defendant's general location to the New York City Police Department, which dispatched officers to arrest him. While being transported to a police station in the Bronx, and unprompted by any questioning from New York City police officers, the defendant began to speak, stating: "You can record everything I say." The defendant explained: "She attacked me because I would not buy her crack. . . . She took the back of a comb, stuck it in my ear. I laid down. She took a ceramic football, smashed me in the face. . . . I pushed her and told her [to] behave herself. She took the scissors [and] put it in her hand. She yanked my hair out of my head. I laughed at her." He continued: "I tried leaving. She . . . stuck [a key] into me and started turning, and I pushed her onto the bed. Then I went into the kitchen to fix myself something to eat. . . . She attacked me with . . . scissors. Then, I blacked out. . . . I wanted you all to kill me. . . . That's how bad my day went. I did nothing to her. . . . What was I supposed to do . . . sit there and let her hurt me? I tried walking out

_____

[3] This court added punctuation to this text message for purposes of clarity.

State *v.* Haynes

the door, and she kept grabbing and pulling, and pushing on me. . . . Shit happens. I did not plan this.''

Meanwhile, Waterbury police detectives traveled to the Bronx to interview the defendant. When they arrived at the police station, they spoke with the defendant, who, over the course of an approximately one hour interview, confessed to killing the victim. During that interview, the detectives took a number of photographs of the defendant, including close-ups of his forehead, arms, ear, and finger. Waterbury police officers also searched the Mitsubishi, in which they found bloody towels and the victim's identification and wallet.

The state charged the defendant with murder. He pleaded not guilty and elected a jury trial, during which he testified in his own defense and raised the affirmative defense of extreme emotional disturbance. The jury returned a verdict of guilty, and the trial court rendered judgment in accordance with the jury's verdict and sentenced the defendant to a term of fifty-two years of imprisonment. This direct appeal followed. See General Statutes § 51-199 (b) (3).

I

The defendant first claims that article first, § 8, of the Connecticut constitution[4] precluded the state from using his confession, which the Waterbury police had obtained in violation of *Miranda* and *Edwards* v. *Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), to impeach his trial testimony. We disagree.

The record reveals the following additional relevant facts and procedural history. On the night of the defendant's arrest, Kyle Howles, a Waterbury police detective, provided the defendant with *Miranda* warnings

---

[4] Article first, § 8, of the Connecticut constitution provides in relevant part: ''No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . .''

State *v.* Haynes

while he was in custody at the Bronx police station. When asked if he wished to waive his rights and to speak with Howles, the defendant said that he needed an attorney. In response, Howles stated: "I can't ask you any more questions. . . . I know you probably have some explanation. You kinda already started to give me an explanation. I can't talk to you without your lawyer present." The defendant then stated that he wanted to talk, without a lawyer present, three different times. The defendant then gave a detailed statement to the Waterbury police about the altercation buring which he had killed the victim.

The defendant moved to suppress the statement he gave to the Waterbury police. After a suppression hearing, the trial court granted the motion in part and ordered the prosecution not to use the statement in its case-in-chief. The court found that (1) the defendant had unequivocally invoked his *Miranda* right to counsel, triggering "the bright-line rule" under *Edwards* that "all interrogation must cease and can only restart if the defendant initiates conversation," and (2) the defendant did not reinitiate the conversation, but, instead, Howles' statement referring to the defendant's probable "explanation" caused the defendant to continue speaking. The trial court found Howles' statement to be the "functional equivalent of an interrogation" but also observed that it was not "intentionally designed to circumvent the defendant's rights."

In accordance with the trial court's ruling, the prosecution did not rely on the defendant's statement to the Waterbury police when presenting its case-in-chief. Additionally, the defendant filed a motion in limine to preclude the state from impeaching him with the suppressed statement. The trial court denied the defendant's motion, relying on this court's decision in *Reid*. See *State* v. *Reid*, supra, 193 Conn. 655 and n.11.

State *v.* Haynes

The defendant testified in support of his affirmative defense of extreme emotional disturbance. During direct examination, the defendant told the jury about his religion, Rastafarianism, and how his dreadlocks are a "natural baptism" that represent his vow of dedication to God. After explaining that his altercation with the victim began when he refused to buy crack cocaine for her, he testified that he "[p]hysically" went "to another emotional state" and hit and stabbed the victim after she "jammed" a comb into his ear and pulled hair from his head. According to the defendant, when the victim "yanked" his dreadlocks, he lost control of himself. The defendant further testified that he did not remember everything he did because he blacked out.

During cross-examination, the prosecutor explored a variety of inconsistencies between the defendant's trial testimony and his statement to the Waterbury police. These inconsistencies included subjects such as his position and location when the altercation with the victim began, whether he was clothed or naked during the altercation, and when his blackout state started and ended. The prosecutor then explored these various points in detail and used multiple sources to call the defendant's testimony into question, such as the Facebook messages with M and K, photographs of the victim's injuries that had already been entered into evidence, and the testimony of Cooper.

During closing argument, the prosecutor highlighted the inconsistencies between the defendant's trial testimony and his statements to the police, and asked the jury to use the statement the defendant made to the Waterbury police in New York only to judge his credibility. In its jury instructions, the trial court also reminded the jury of the limited purpose of this evidence.

On appeal, the defendant claims that, under article first, § 8, of the Connecticut constitution, the state should not have been permitted to impeach his trial

State *v.* Haynes

testimony with the statement he made to the Waterbury police after he invoked his *Miranda* right to counsel. He asks us to overrule *Reid*, which followed the United States Supreme Court's decision in *Harris* v. *New York*, 401 U.S. 222, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971), and held, as a matter of state constitutional law, that prior inconsistent statements obtained in violation of *Miranda* may be used to impeach a defendant's trial testimony. *State* v. *Reid*, supra, 193 Conn. 655; see also id., 655 n.11 ("Although [this court has] interpreted article first, § 8 . . . to provide greater guarantees than its federal counterpart . . . we decline to do so in this instance. We find the reasoning in *Harris* . . . persuasive and adhere to that decision." (Citation omitted.)). The defendant argues that *Reid* was wrongly decided because this court did not conduct "a full analysis of the independent constitutional claim but simply adopted the rationale of *Harris* in a conclusory footnote." In support of his contention that the Connecticut constitution provides greater protection than the federal constitution, the defendant's analysis under *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), focuses on the historical insights, case law from other states, and public policy factors. We are not persuaded that *Reid* was wrongly decided and conclude that the state's use of the defendant's otherwise voluntary statement for impeachment purposes did not violate the Connecticut constitution.

The defendant correctly observes that *Reid*'s analysis of this issue lacked the benefit of full briefing or analysis of the issue based on the now familiar factors articulated in *Geisler*, which was decided approximately eight years after *Reid*. This court's decision in *Geisler*, however, did not purport to do anything more than collect from our prior state constitutional precedent certain "tools of analysis [that] should be considered to the extent applicable"; id., 685; because they were useful

State *v.* Haynes

in construing the "contours of our state constitution and [in] reach[ing] reasoned and principled results . . . ." Id., 684. Although *Geisler* provides us with a framework for "a more robust consideration" of the state constitutional claim in the present case; *State* v. *Langston*, 346 Conn. 605, 625, 294 A.3d 1002 (2023), cert. denied, U.S. , 144 S. Ct. 698, 217 L. Ed. 2d 391 (2024); the advent of the *Geisler* analysis does not by itself diminish the precedential value of *Reid* as a matter of state constitutional law.[5] See, e.g., *State* v. *Williams*, 311 Conn. 626, 632–33, 88 A.3d 534 (2014); *State* v. *James*, 237 Conn. 390, 413–14, 678 A.2d 1338 (1996).

Thus, our *Geisler* analysis is informed by the doctrine of stare decisis, which "counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 170, 920 A.2d 236 (2007). Stare decisis principles require a "clear showing that an established rule is incorrect and harmful before it is abandoned . . . ." (Internal quotation marks omitted.) *State* v. *McElveen*, 261 Conn. 198, 212, 802 A.2d 74 (2002). A claimant must demonstrate not merely the preferability of a different rule but provide reasons that are so " 'inescapable' " as to compel this court to overrule precedent. *State* v. *Henderson*, 348 Conn. 648, 657, 309 A.3d 1208 (2024).

In considering the continuing vitality of *Reid*, we begin with the well settled proposition that "the federal constitution sets the floor, not the ceiling, on individual rights." *State* v. *Purcell*, 331 Conn. 318, 341, 203 A.3d 542 (2019). "In construing the Connecticut constitution to determine whether it provides our citizens with greater protections than the federal constitution, we

[5] The release of *Geisler* in 1992 did not mark the beginning of our state constitutional jurisprudence. See generally *State* v. *Marsala*, 216 Conn. 150, 579 A.2d 58 (1990); *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 469 A.2d 1201 (1984); *Horton* v. *Meskill*, 172 Conn. 615, 376 A.2d 359 (1977).

State *v.* Haynes

employ a multifactor approach that we first adopted in [*Geisler*]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable economic and sociological norms [otherwise described as public policies]."[6] (Internal quotation marks omitted.) *State* v. *Griffin*, 339 Conn. 631, 691, 262 A.3d 44 (2021), cert. denied,      U.S.    , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022).

"The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party . . . can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in

---

[6] The state argues that a *Geisler* analysis is reserved for questions of state constitutional interpretation and is not applicable to prophylactic rules that protect established constitutional rights. It cites *State* v. *Purcell*, supra, 331 Conn. 318, in which this court suggested as much and offered the possibility that a "policy centered weighing process" may be more appropriate than a *Geisler* analysis. Id., 343 n.16. We also noted in *Purcell* that this court had previously considered the *Geisler* factors when deciding whether to adopt a prophylactic rule under the state constitution. Id.; see, e.g., *State* v. *Harris*, 330 Conn. 91, 115, 131, 191 A.3d 119 (2018) (federally established framework for eyewitness identification inadequately protects defendants' due process rights under state constitution); *State* v. *Jenkins*, 298 Conn. 209, 261, 282–83, 3 A.3d 806 (2010) (declining to adopt heightened requirements for consent searches during routine traffic stops); *State* v. *Lawrence*, supra, 282 Conn. 177 (declining to adopt heightened standard of proof for establishing voluntariness of confession); *State* v. *Piorkowski*, 243 Conn. 205, 221, 700 A.2d 1146 (1997) (declining to require presence of counsel for valid waiver of right to counsel when defendant had initiated communication with police and had properly been advised of his *Miranda* rights). As in *Purcell*, the result in the present case would be the same under either approach. The policy centered weighing process the state favors is embedded in a *Geisler* analysis as the sixth factor because "the economic and sociological considerations factor . . . is in essence a public policy analysis . . . ." *Fay* v. *Merrill*, 338 Conn. 1, 50, 256 A.3d 622 (2021).

State *v.* Haynes

order to stress that a systemic analysis is required, we recognize that they may be inextricably interwoven. . . . [N]ot every *Geisler* factor is relevant in all cases. . . . Moreover, a proper *Geisler* analysis does not require us simply to tally and follow the decisions favoring one party's state constitutional claim; a deeper review of [their] underpinnings is required because we . . . follow [only] persuasive decisions. . . . The *Geisler* analysis applies to cases in which the state constitution has no federal analogue, as well as those in which the claim is that the state constitution provides greater protection than does the federal constitution.'' (Internal quotation marks omitted.) *State* v. *Jose A. B.*, 342 Conn. 489, 508, 270 A.3d 656 (2022).

Finding no meaningful guidance from the text or history of Connecticut's due process clause,[7] we focus our *Geisler* analysis on precedent from Connecticut and other states, federal precedent, and public policy factors. Our analysis begins with the United States Supreme

_____

[7] With respect to the text of article first, § 8, of the Connecticut constitution, it is well settled that ''[t]he due process clauses of the state and the federal constitutions are virtually identical. . . . Although we have stated that this similarity neither precludes nor favors a determination that [the state constitutional provisions] impose any burden higher than the federal constitution . . . we have also concluded, in construing the due process clause in article first, § 8, of our state constitution that the similarity between the two provisions . . . support[s] a common source and, thus, a common interpretation of the provisions.'' (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Lockhart*, 298 Conn. 537, 551–52, 4 A.3d 1176 (2010). Nevertheless, it has been well settled since *Fasulo* v. *Arafeh*, 173 Conn. 473, 378 A.2d 553 (1977), that the state due process clause ''shares but is not limited by the content of its federal counterpart.'' Id., 475.

As for the historical circumstances surrounding the adoption of article first, § 8, of the Connecticut constitution, the defendant correctly notes that the right to counsel has deep roots in Connecticut, predating the adoption of the state constitution in 1818, and well before *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). The defendant fails, however, to establish how this history demonstrates that protecting the truth seeking function of a trial by allowing impeachment with voluntary, but *Miranda* violative statements is ''clearly wrong'' and not sufficiently protected by precluding their use in the state's case-in-chief.

State *v.* Haynes

Court's decision in *Harris*, in which the court held that statements obtained in violation of *Miranda*, but that are otherwise made voluntarily, may be used to impeach the credibility of a defendant who testifies at trial. *Harris* v. *New York*, supra, 401 U.S. 224–26. In arriving at this conclusion, the court reasoned that, "[t]he impeachment process . . . undoubtedly provide[s] valuable aid to the jury in assessing [the] petitioner's credibility, and the benefits of this process should not be lost . . . because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule[8] has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its [case-in-chief]." (Footnote added.) Id., 225. The court emphasized that prosecutors must be allowed to "utilize the traditional [truth testing] devices of the adversary process" because the privilege to testify in one's own defense "cannot be construed to include the right to commit perjury." Id.; see also *Oregon* v. *Hass*, 420 U.S. 714, 722–23, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975) (statement improperly obtained after police officer gave full *Miranda* warnings was properly used for impeachment because "the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances," insofar as "inadmissibility would pervert the constitutional right into a right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth").

_____

[8] "As a general principle, the exclusionary rule bars the government from introducing at trial evidence obtained in violation of the . . . United States constitution. . . . The rule applies to evidence that is derived from unlawful government conduct, which is commonly referred to as the fruit of the poisonous tree . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Brocuglio*, 264 Conn. 778, 786, 826 A.2d 145 (2003).

352 Conn. 236 JULY, 2025 249

State *v.* Haynes

In *Reid*, this court considered federal and state constitutional claims arising from *Harris*. See *State* v. *Reid*, supra, 193 Conn. 650–56. First considering the defendant's federal constitutional claims, this court rejected his argument that the *Harris* impeachment exception was limited to only those prior inconsistent statements that would "expose 'in-court perjury' . . . ." Id., 654. This court explained that "[p]rior inconsistent statements have been considered an effective method of testing veracity. Depriving the prosecution of this [well established] tool for eliciting the truth would only marginally advance the policies of the exclusionary rule, while concurrently frustrating society's need to arrive at the truth." Id., 654–55. This court then rejected the defendant's request to "depart from the rationale of *Harris* . . . and [to] adopt an absolute exclusionary rule as a matter of state constitutional law" pursuant to article first, § 8, of the Connecticut constitution. Id., 655 n.11. This court declined to interpret the state constitution "to provide greater guarantees than its federal counterpart . . . in [that] instance," emphasizing that it found the reasoning of *Harris* "persuasive and [would] adhere to that decision."[9] (Citation omitted.) Id.

---

[9] Prior to *Reid*, this court had approved of the admission of otherwise excluded evidence for impeachment purposes on several occasions, illustrating that *Reid* did not mark a sea change with respect to this court's view of such evidence. See, e.g., *State* v. *Marino*, 190 Conn. 639, 656, 462 A.2d 1021 (1983) ("[because] the defendant did testify at his trial, if there were any inconsistencies between his testimony and his prior statements to the police, these were available for cross-examination as to his credibility regardless of whether they may have resulted from an illegal seizure"), overruled on other grounds by *State* v. *Chapman*, 229 Conn. 529, 643 A.2d 1213 (1994); *State* v. *Nardini*, 187 Conn. 513, 517–18, 447 A.2d 396 (1982) ("[s]tatements of a defendant [that] have been obtained after a failure to comply with the requirements for an effective waiver of the right to counsel or the privilege against self-incrimination may be used in cross-examining him after he has taken the witness stand at the trial").

Subsequent Connecticut decisions have echoed *Reid*. See, e.g., *State* v. *Mangual*, 311 Conn. 182, 192 n.10, 85 A.3d 627 (2014) ("*Miranda* is not a license to commit perjury, and statements obtained in violation of *Miranda*, if not the product of improper police coercion, are admissible for impeach-

State *v.* Haynes

The defendant contends that the United States Supreme Court's policy analysis in *Harris* and, by extension, this court's policy analysis in *Reid* were incorrect and that the impeachment exception encourages police to flout *Edwards*. Principally, the defendant relies on an article in the Connecticut Law Review and argues that it is far more likely (and less speculative) that a suspect will lie or confess falsely in a prearrest interview, given the fear and power imbalances inherent in custodial interrogation, which have a particularly strong effect on " 'members of social groups with disproportionately high conviction rates, such as young black men, [who] may despair of release and conclude they must confess to something to escape a worse fate.' "[10]

ment purposes"); *State* v. *Burge*, 195 Conn. 232, 250–51, 487 A.2d 532 (1985) ("[e]vidence may be admissible for purposes of impeachment even though it was obtained in violation of the fourth amendment [to the United States constitution] or the requirements of *Miranda*"); *State* v. *Rollins*, 20 Conn. App. 27, 34, 564 A.2d 318 ("[s]tatements of a defendant [that] have been obtained after a failure to comply with the requirements for an effective waiver of the right to counsel or the privilege against self-incrimination may be used in cross-examining him after he has taken the witness stand at the trial" (internal quotation marks omitted)), cert. denied, 213 Conn. 803, 567 A.2d 833 (1989).

[10] The defendant also cites to *State* v. *Gonzalez*, 302 Conn. 287, 25 A.3d 648 (2011), in which a police officer told a suspect that "it was his opportunity to tell his side of the story" in order to "prompt [him] to converse about the murder." Id., 299. He further relies on a 2002 law review article, in which the author catalogued cases involving wilful *Miranda* violations between 1981 and 1996. See generally E. Sanders, "Willful Violations of Miranda: Not a Speculative Possibility but an Established Fact," 4 Fla. Coastal L.J. 29 (2002). That article is not persuasive insofar as Connecticut was a subject of the survey, and the author found no instances of wilful or intentional violations of *Miranda* or *Edwards* in the state during that time period. Id., 37 n.68. At several instances during oral argument before this court, including in response to questions from the court, the defendant's appellate counsel could point to only the present case and three cases currently on the appellate docket as proof that the *Harris* rule incentivizes the police to ignore defendants' requests for counsel.

"[T]he legitimacy of prophylactic constitutional rules derives from their necessity." C. Rogers, "Putting Meat on Constitutional Bones: The Authority of State Courts To Craft Constitutional Prophylactic Rules Under the Federal Constitution," 98 B.U. L. Rev. 541, 565 (2018). There is general agreement

State *v.* Haynes

See D. Young, "Unnecessary Evil: Police Lying in Interrogations," 28 Conn. L. Rev. 425, 468 (1996). He also claims that we should adopt the policy balancing articulated by the Oregon Supreme Court in *State* v. *Isom*, 306 Or. 587, 761 P.2d 524 (1988), namely: "No one, including a criminal defendant, has the 'right' to give false testimony. Nor does anyone have the 'right' to commit murder or robbery. But all citizens, including criminal defendants, have constitutional rights, and the state may not prove, over objection, any crime with unconstitutionally obtained evidence." Id., 595.

Although criminal defendants possess unique constitutional rights, the defendant has not clearly established that the current policy balancing, articulated in *Harris* and *Reid*, does not adequately protect those rights by precluding the state from relying on illegally obtained evidence in its case-in-chief. This is particularly so given the prophylactic nature of the rules announced in *Miranda* and *Edwards*; see, e.g., *Michigan* v. *Harvey*, 494 U.S. 344, 350, 110 S. Ct. 1176, 108 L. Ed. 2d 293 (1990); *Michigan* v. *Tucker*, 417 U.S. 433, 443–44, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974); which were intended to counteract the inherently coercive nature of custodial interrogations. See, e.g., *Miranda* v. *Arizona*, supra, 384 U.S. 457–58. Because "[t]he value of any prophylac-

that courts should use their authority to devise prophylactic rules cautiously and to tailor them to be as narrow as possible to accomplish their purpose. See id. Courts create prophylactic rules when they determine that "the risk of a constitutional violation is sufficiently great [such] that simple case-by-case enforcement of the core right is insufficient to secure that right." B. Landsberg, "Safeguarding Constitutional Rights: The Uses and Limits of Prophylactic Rules," 66 Tenn. L. Rev. 925, 950 (1999). This court has demonstrated that it will devise and implement additional prophylactic rules, beyond those that federal law compels, when we are persuaded that they are necessary to protect the constitutional rights within our state. See, e.g., *State* v. *Purcell*, supra, 331 Conn. 361–62. The defendant has not convinced us that additional prophylaxis is necessary. In particular, the trial court found that the constitutional violation in this case was unintentional and that the statement was not coerced. On the basis of this record, we cannot conclude that the policy balance adopted in *Reid* should be overruled.

State *v.* Haynes

tic rule . . . must be assessed not only on the basis of what is gained, but on the basis of what is lost''; (internal quotation marks omitted) *State* v. *Francis*, 322 Conn. 247, 266, 140 A.3d 927 (2016); we agree with the United States Supreme Court that to extend the exclusionary rule from the case-in-chief to impeachment evidence would impair the truth seeking process of a criminal trial. See *Harris* v. *New York*, supra, 401 U.S. 225. The impeachment process provides a valuable aid to the jury in assessing the credibility of a defendant—or any other witness—and the jury should not be deprived of that benefit as a result of speculative claims that the possibility of obtaining impeachment evidence encourages police misconduct. When a defendant exercises his right to testify in his own defense, that choice comes with an obligation to speak truthfully and accurately, like any other witness. See, e.g., *State* v. *Vega*, 163 Conn. 304, 306–307, 306 A.2d 855 (1972); see also *State* v. *Francis*, 317 Conn. 450, 460, 118 A.3d 529 (2015) (defendant's right to testify on his own behalf "includes the right to testify fully, without perjury, to matters not precluded by a rule of evidence" (internal quotation marks omitted)); *State* v. *Perkins*, 271 Conn. 218, 244, 856 A.2d 917 (2004) (noting "tactical" nature of defendant's potentially difficult choice whether to testify and that "the truth seeking function of the criminal trial trumps").

The overwhelming weight of authority from other states aligns with Connecticut's existing view of the *Harris* impeachment exception. Beyond Alaska, Hawaii, Oregon,[11] and, to some extent, Vermont, "the impeach-

[11] In *State* v. *Santiago*, 53 Haw. 254, 492 P.2d 657 (1971), the Hawaii Supreme Court held that, under that state's constitution, unless proper *Miranda* warnings are given, "statements made by the accused may not be used either as direct evidence in the prosecutor's [case-in-chief] or to impeach the defendant's credibility during rebuttal or cross-examination.'' Id., 266. The court rejected the policy balancing articulated in *Harris*, stating that, although lying on the witness stand is undesirable, the "countervailing value of protecting the accused's privilege to freely choose whether or not

State *v.* Haynes

ment exception is accepted in nearly every state . . . and has been found to extend to violations of constitutional rights as well as violations of *Miranda*'s prophylactic rules."[12] *State* v. *Burris*, 145 N.J. 509, 524, 679

to incriminate himself . . . must be maintained, even though it necessitates that a certain number of criminals must go free in order to preserve the rights of all persons accused of crimes." Id., 267.

Similarly, in *State* v. *Isom*, supra, 306 Or. 587, the Oregon Supreme Court rejected the federal impeachment rule. See id., 589. The court distinguished failure to warn cases, such as *Harris*, from cases in which a defendant affirmatively invokes his rights, and the police "blithely" and purposely disregard that assertion and persist in questioning him. Id., 593; see id., 593–94. In failure to warn-cases, the court reasoned, "the argument that exclusion of evidence from the state's case-in-chief provides sufficient incentive for police officers to give the required information is at least plausible. *There is no incentive at all, however, coming from a rule that permits the admission for impeachment of statements obtained through interrogation after a suspect has refused to talk or has asked for a lawyer.* Once a suspect invokes the right to remain silent or the right to consult a lawyer, the police are unlikely to get anything further without counsel present unless they continue to interrogate the suspect. Under such a rule, any statements made before the invocation of rights would still be fully admissible, and any statements made thereafter would be admissible for impeachment." (Emphasis added; footnote omitted.) Id., 594.

The defendant points us to *State* v. *Batts*, 195 P.3d 144 (Alaska App. 2008), in which the Alaska Court of Appeals held that a legislative rule of evidence codifying the *Harris* impeachment exception did not violate the Alaska constitution, unless (1) the *Miranda* violations in question are intentional, or (2) "the police engage in interrogation (even in good faith) that any reasonable police officer would know violates *Miranda*." Id., 157. That holding has never been reviewed by Alaska's Supreme Court; see *Wagner* v. *State*, 347 P.3d 109, 114 n.28 (Alaska 2015); and has not been followed in any other jurisdiction. We also note that the Alaska rule would not have precluded the impeachment of the defendant in the present case, given the trial court's finding that the *Miranda* violation was not intentional.

[12] For additional case law from states that follow the *Harris* impeachment exception, see, for example, *State* v. *Swinburne*, 116 Ariz. 403, 411–12, 569 P.2d 833 (1977), *People* v. *Velarde*, 196 Colo. 254, 257–58, 586 P.2d 6 (1978), *State* v. *Durepo*, 472 A.2d 919, 922–23 (Me. 1984); *People* v. *Wilson*, 28 N.Y.3d 67, 72–73, 64 N.E.3d 286, 41 N.Y.S.3d 466 (2016), and *Riddell* v. *Rhay*, 79 Wn. 2d 248, 250, 252–53, 484 P.2d 907, cert. denied, 404 U.S. 974, 92 S. Ct. 336, 30 L. Ed. 2d 291 (1971).

Although the high courts of California and Pennsylvania initially rejected the *Harris* impeachment exception in *People* v. *Disbrow*, 16 Cal. 3d 101, 113, 545 P.2d 272, 127 Cal Rptr. 360 (1976), and *Commonwealth* v. *Triplett*,

State *v.* Haynes

A.2d 121 (1996). We agree with the majority approach adopting the *Harris* line of cases, consistent with this court's decision in *Reid*, and do not view the policy balancing of Hawaii and Oregon as providing the most "cogent reasons and inescapable logic" necessary to overcome stare decisis. (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 170.

In his concurring and dissenting opinion, Justice Ecker proposes an alternative approach to the impeachment rule. See *State* v. *Kidd*, 281 Md. 32, 49, 375 A.2d 1105, cert. denied, 434 U.S. 1002, 98 S. Ct. 646, 54 L. Ed. 2d 498 (1977); see also *State* v. *Brunelle*, 148 Vt. 347, 353, 534 A.2d 198 (1987). Under this approach, previously suppressed evidence is unavailable to the state for impeachment purposes except to challenge the defendant's "specific credibility arising from a realistic contradiction between the issues he initiated on direct examination and the impeaching statement." *State* v. *Kidd*, supra, 49. In Justice Ecker's view, this rule would have precluded the admission of the relevant parts of the defendant's statement in the present case because "[n]ot a single one" directly contradicted his testimony but, instead, were "merely inconsistent" statements. We disagree with this approach. We have long recognized that inconsistencies provide juries with a method for testing the reliability of the testimony of any witness,

462 Pa. 244, 248–49, 341 A.2d 62 (1975) (plurality opinion), respectively, the voters of both states thereafter adopted constitutional amendments that abrogated those decisions. See *People* v. *May*, 44 Cal. 3d 309, 318, 748 P.2d 307, 243 Cal. Rptr. 369 (1988) (explaining that California voters' adoption of constitutional amendment "to dispense with exclusionary rules derived solely from the state [c]onstitution" rendered it "not reasonably likely that [they] intended to preserve, in the form of a statutory privilege, a judicially created exclusionary rule expressly rejected by the United States Supreme Court under the federal constitution" (emphasis omitted; internal quotation marks omitted)); *Commonwealth* v. *Molina*, 628 Pa. 465, 495, 104 A.3d 430 (2014) (concluding that amendment to Pennsylvania constitution in response to *Triplett* "protects [the] adversary system by allowing the [c]ommonwealth to challenge the defendant's testimony with prior inconsistent statements").

State *v.* Haynes

including a defendant. See, e.g., *State* v. *Richardson*, 214 Conn. 752, 763–64, 574 A.2d 182 (1990); see also *Grunewald* v. *United States*, 353 U.S. 391, 418, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957) (impeachment by prior inconsistent statement is "an elementary rule of evidence"). This approach departs from the black letter principle that "[i]nconsistencies may be shown not only by contradictory statements but also by omissions." *State* v. *Whelan*, 200 Conn. 743, 748 n.4, 513 A.2d 86, 91, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). "Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection." (Citation omitted; internal quotation marks omitted.) Id., 748–49 n.4; see id., 749 n.4 (noting "evasive answers" may also furnish basis for inconsistency). Justice Ecker's approach would require an evaluation of the level of contradiction presented by each individual piece of evidence and does not accord with the well established principle that, "[i]n determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined." Id., 748 n.4.

Instead, we find persuasive the decision of the New York Court of Appeals in *People* v. *Wise*, 46 N.Y.2d 321, 385 N.E.2d 1262, 413 N.Y.S.2d 334 (1978), in which, after adopting the policy principles of both *Harris* and *Oregon* v. *Hass*, supra, 420 U.S. 714, the court rejected an approach similar to that proposed by Justice Ecker. See *People* v. *Wise*, supra, 327–29. The court applied "seasoned impeachment principles"; id., 327; and "familiar rules of evidence"; id., 328; to hold that such

State *v.* Haynes

statements need not directly contradict the defendant's testimony. See id., 329; see also id., 326 ("a more rigorous rule requiring direct contradiction would be at odds with the purpose underlying use of prior inconsistents, since such statements are admitted principally to assist the jury in its fact-finding role"); id., 327–28 ("[s]imply put, [when] a defendant's trial testimony offers one version of the events in question, and his prior remark to a police officer suggests a contrary view of those events, the jury is entitled to hear the previous statement so that it may fully assess the witness' credibility").

Guided by *Geisler*, as well as stare decisis considerations, we conclude that the defendant, who challenges *Reid*'s continuing vitality, has not established inescapable reasons that would compel us to overrule *Reid*'s holding that excluding illegally obtained evidence from the state's case-in-chief provides a sufficient deterrent effect to vindicate the prophylactic rules of *Miranda* and *Edwards*. See *State* v. *Henderson*, supra, 348 Conn. 657. We are not persuaded that the current remedy of exclusion from the state's case-in-chief is clearly wrong, particularly in cases such as the present one, in which the *Miranda* violation was unintentional and the statement was otherwise voluntary in nature. We also view the approach espoused by Justice Ecker as inconsistent with the truth seeking function of cross-examination and, similarly, not sufficiently compelling to justify a departure from *Reid*. Because we continue to follow the *Harris* impeachment exception under article first, § 8, of the Connecticut constitution, we conclude that the trial court correctly limited the remedy for the *Miranda* violation to precluding the prosecution from using the defendant's statement in its case-in-chief.[13]

--------

[13] The trial court in the present case provided the proper limiting instruction to the jury regarding the use of this impeachment evidence to mitigate any prejudice that may occur. We presume, without evidence to the contrary, that a jury follows a trial court's instructions. See, e.g., *State* v. *Griggs*, 288 Conn. 116, 142, 951 A.2d 531 (2008).

State *v.* Haynes

## II

We next address the defendant's claim that the trial court improperly admitted photographs that the Waterbury police had taken of the defendant during his interview with them. The defendant argues that his rights were violated under the fifth amendment to the United States constitution because *United States* v. *Patane*, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004), which allows physical fruits of an illegally obtained statement to be entered into evidence; id., 634 (opinion announcing judgment); applies only when officers fail to provide *Miranda* warnings, and not in the *Edwards* situation, in which warnings have been given but a request for an attorney has been ignored. Alternatively, the defendant argues that the photographs were inadmissible under article first, § 8, of the Connecticut constitution. We disagree with the defendant on both grounds.

The record reveals the following additional relevant facts. On the third day of evidence, the trial court heard arguments, outside the presence of the jury, regarding the prosecutor's intention to call Howles to testify about photographs he had taken of the defendant during the interview that resulted in the suppressed statement. Defense counsel objected and argued that the photographs were the fruit of the poisonous tree because the statement had been suppressed. The prosecutor then withdrew two of the six photographs he had originally planned to enter into evidence through Howles but renewed the request with respect to the remaining four, indicating that it would "put an offer of proof" through Howles.

After hearing that offer of proof,[14] the trial court overruled defense counsel's objection, reasoning that, even

---

[14] During the offer of proof, Howles testified that, when a person is arrested, he checks them for injuries and documents what he finds "for any evidentiary value, especially [when] . . . a crime of [a] violent nature [is involved]." He further explained that, even if the defendant had not given

State *v.* Haynes

if the photographs were obtained as a result of the illegally obtained statement, "they are physical fruits of a *Miranda* violation, which [are] not suppressible under our law," and, "alternatively, even if they could be suppressed under that argument, [the court] credit[s] [Howles'] statement that they would have been taken in any event."

The jury returned, and Howles testified that, as part of his investigative duties, he looks for and documents injuries or lack of injuries to suspects and arrestees, and he followed that process when he met the defendant at the police station in the Bronx. The trial court subsequently admitted the four photographs into evidence. Thereafter, the prosecutor utilized these photographs during cross-examination and during his closing argument to challenge the credibility of the defendant's account of the altercation and to argue that no reasonable person in the defendant's position, with such minor injuries, would have reacted to the victim in the violent manner that he did. Defense counsel did not object to any portion of the prosecutor's closing argument.

On appeal, the defendant argues that the trial court violated his fifth amendment rights when it admitted the photographs taken during the interview with the Waterbury police and that the rule established in *Patane* does not apply to this case. The defendant claims that *Patane*'s holding is limited to "failure to warn" cases and that, whether the physical fruits of statements obtained in violation of *Edwards* may be admitted,

a statement, as part of the routine procedures, he would have looked for injuries and documented anything that he found. Howles acknowledged that two close-up photographs of the defendant's forehead and ear were not taken as part of the arrest procedure. The state informed the court that it would not be offering those two photographs into evidence. As for the other four photographs, which depicted the defendant's face, forearms, and finger, Howles testified that he would have taken those photographs, regardless of whether the defendant had spoken to him.

State *v.* Haynes

remains an open question of law. We conclude that the photographs were not physical "fruits" of the illegally obtained statement and, therefore, do not reach the defendant's claim under *Patane*.

Under the independent source doctrine, evidence obtained for reasons unrelated to unlawful police conduct is not a fruit of such conduct. See, e.g., *Nix* v. *Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). It is well established that "the interest of society in deterring unlawful police conduct and the public interest in having [fact finders] receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse*, position that they would have been in if no police error or misconduct had occurred." (Emphasis in original; internal quotation marks omitted.) *State* v. *Vivo*, 241 Conn. 665, 672, 697 A.2d 1130 (1997), quoting *Nix* v. *Williams*, supra, 443. To determine whether a lawful means for obtaining evidence was independent from unlawful police activity, a court "must ask whether [the evidence] would have been sought even if [the tainted activity that] actually happened had not occurred . . . ." (Internal quotation marks omitted.) *State* v. *Vivo*, supra, 677, quoting *Murray* v. *United States*, 487 U.S. 533, 542 n.3, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988); see also *State* v. *Correa*, 340 Conn. 619, 668, 264 A.3d 894 (2021). Routine photographs of criminal defendants taken in connection with arrests are a lawful procedure, even when a *Miranda* violation has occurred, "because a photograph is not a confession or other evidence of a testimonial nature." *State* v. *Hackett*, 182 Conn. 511, 516, 438 A.2d 276 (1980). Moreover, the state did not offer two photographs that derived from the defendant's illegally obtained statement. The remaining four photographs that were admitted into evidence had an independent source in a lawful photographing protocol and, therefore, were admissible.

State *v.* Haynes

In the present case, the trial court credited Howles' testimony that he ordinarily takes photographs of suspects involved in violent crimes to show both the presence of injuries and the lack thereof, and that, in this case, he acted in accordance with his standard procedure and would have done so regardless of whether the defendant had given a statement. We defer to that credibility determination. See, e.g., *State* v. *Castillo*, 329 Conn. 311, 322, 186 A.3d 672 (2018). Because the photographs had an independent source in the police procedure of photographing arrestees, they were not fruits of the illegally obtained statement, thereby requiring analysis under *Patane*.

Alternatively, the defendant argues that the photographs were inadmissible under article first, § 8, of the Connecticut constitution, and asks this court to hold that our constitution requires suppression of physical evidence derived from an illegally obtained statement as "fruit of the poisonous tree." Because the defense objected to the admission of this evidence on federal, and not state, constitutional grounds, he asks for review of this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). We need not decide this state constitutional issue, however, because it is resolved by our conclusion that the photographs had an independent, untainted source in standard police protocol, as established through Howles' testimony, which the trial court credited. See, e.g., *State* v. *McCahill*, 261 Conn. 492, 501, 811 A.2d 667 (2002) (this court does "not engage in addressing constitutional questions unless their resolution is unavoidable").

Accordingly, we conclude that the admission of the four photographs did not violate the defendant's rights under the state or federal constitutions.

State *v.* Haynes

III

Finally, the defendant claims that the trial court improperly allowed the prosecution to call a witness it had not disclosed until three days prior to the start of evidence, thereby depriving him of a fair trial. We disagree.

The following additional facts are relevant to this claim. When the trial court granted in part the defendant's motion to suppress his statement to the Waterbury police, the prosecutor requested a six week continuance. The prosecutor had argued that the defendant's motion was untimely because it was not filed within ten days after the first pretrial conference, as required by Practice Book § 41-5; in this case, that conference had taken place years earlier. The prosecutor explained that the suppression of the statement had rendered it necessary to call and prepare additional witnesses. When asked why he had not raised this issue when the court indicated that it would hear the matter at the end of jury selection, the prosecutor responded: "Candidly? Nobody thought it would be granted." The court commented, "[t]hat's your mistake," and denied the request for a six week continuance.

Prior to the start of evidence, the trial court heard arguments on the defendant's motion to preclude testimony from a late disclosed witness, the victim's sister-in-law, K. In his motion, the defendant argued that K's name had not appeared in any prior exchange of discovery and that the defense had no contact information or criminal history for her, and, thus, was unable to prepare for cross-examination with such short notice. The prosecutor explained that K possessed Facebook messages that the defendant had sent to her right before his arrest, in which he admitted to killing the victim, and that, although the prosecutor knew of this information, as K had spoken to the victim's advocate in 2018,

State *v.* Haynes

he had not initially planned to call her as a witness because she was residing in North Carolina. Immediately after the defendant's motion to suppress was granted, the prosecutor contacted K, obtained screenshots of the messages, and shared them with the defense. The prosecutor also informed the defense that K had no pending criminal charges and a 1993 conviction. At the time of that hearing, K was out of the country but would return in time to testify at trial; the prosecutor provided her phone number and made her available to the defense.

In ruling on the motion to preclude, the trial court considered "whether there [was] good cause for the delay, the extent of prejudice to the defendant, and the feasibility of other remedies." The court found that the prosecutor had good cause in adding the witness late because the defendant had filed his motion to suppress "well beyond the presumptive deadline of ten days after the first pretrial conference, which took place . . . in 2019," resulting in short notice to the prosecutor of the need for additional testimony of the defendant's admitting to the killing. The court also found that any prejudice to the defendant was de minimis because the defendant knew he had confessed to K via Facebook Messenger from the outset of the case. Finally, the court determined that a continuance was not feasible because the jury had already been selected. Accordingly, the court denied the motion.

"[T]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In determining what sanction is appropriate for failure to comply with court ordered discovery, the trial court should consider the reason why disclosure was not

State *v.* Haynes

made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances.'' (Internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 186, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001). Further, Practice Book § 40-13 (c) provides: ''No witness shall be precluded from testifying for any party because his or her name or statement or criminal history was not disclosed pursuant to this rule if the party calling such witness did not in good faith intend to call the witness at the time that he or she provided the material required by this rule. In the interests of justice the judicial authority may in its discretion permit any undisclosed individual to testify.''

We conclude that the trial court did not abuse its discretion by allowing the prosecutor to call K to testify. The record supports the fact that the prosecutor did not believe that he needed K's testimony when preparing his initial witness list. K lived out of state, and the prosecution planned to offer the defendant's statement, which the court suppressed right before trial. The court adequately considered the *Respass* factors when ruling on the defendant's motion to preclude K from testifying.

More important, as the primary purpose of a sanction for violation of a discovery order is the protection of the defendant's rights, the defendant has not demonstrated any prejudice from the delay in disclosure of K's testimony. The record does not establish that the defense was unable to prepare for K's testimony. When asked by the trial court what prejudice would result, defense counsel identified none and acknowledged that there was less harm from K's testimony than from a late disclosed expert witness. The defendant's only assertion is that the content of K's testimony was damaging to his case, which is irrelevant to the inquiry because that is not a function of delay. Because Practice Book

State *v.* Haynes

§ 40-13 (c) embraces a presumption against precluding a witness' testimony as a sanction for a delayed disclosure, and because the defendant has made no showing of any prejudice from the delayed disclosure, the trial court did not abuse its discretion in permitting K's testimony or violate the defendant's right to a fair trial.

The judgment is affirmed.

In this opinion MULLINS, C. J., and McDONALD, D'AURIA and DANNEHY, Js., concurred, and, as to parts II and III, ECKER, J., concurred.


ECKER, J., concurring in part and dissenting in part.[1] This appeal provides this court with an opportunity to fashion an exclusionary rule under our state constitution that is tailored with optimal care and precision to properly balance the competing principles that must be honored when the government wants to use an illegally obtained statement to impeach the trial testimony of a defendant in a criminal case. In my view, there are compelling grounds to reject the federal approach in favor of a more nuanced exclusionary doctrine that better serves those principles. More specifically, I would conclude that, under article first, § 8, of the Connecticut constitution,[2] voluntary statements obtained in violation of *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and *Edwards* v. *Arizona*, 451 U.S. 477, 483–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), may be used to impeach the in-court testimony of a defendant only if the tainted statement and the defendant's testimony at trial are not merely

---

[1] I join parts II and III of the majority opinion but dissent from part I.

[2] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . . No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

State *v.* Haynes

inconsistent, but contradictory, meaning that they cannot both be true.[3]

I regret that the majority does not embrace this opportunity to develop our state constitutional law by fully exploring the options available to us rather than adhering to the flawed policy adopted under the federal constitution by a single vote majority of the United States Supreme Court in *Harris* v. *New York*, 401 U.S. 222, 225–26, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971), and ratified by this court in a single, unelaborated sentence tucked into a footnote in *State* v. *Reid*, 193 Conn. 646, 655 n.11, 480 A.2d 463 (1984). The doctrine of stare decisis, relied on by the majority to justify treating *Reid* as controlling precedent under our state constitution, has no proper role in the analysis of the constitutional issue now before this court. Simply put, neither *Harris* nor *Reid* addressed the issue sub judice, namely, whether the

---

[3] As they are not implicated by the facts of this case, I would defer consideration of two possible additions to this framework for determining the admissibility of illegally obtained statements for impeachment purposes. First, in cases in which the defendant's in-court testimony is limited to a bare denial of the charged criminal conduct, courts have held that the illegally obtained statement cannot be used for impeachment at all. See, e.g., *People* v. *Taylor*, 8 Cal. 3d 174, 182, 501 P.2d 918, 104 Cal. Rptr. 350 (1972) (in narcotics case, illegally obtained evidence is inadmissible for any purpose if defendant's testimony on direct examination is mere denial of commission of crime); *People* v. *Hearn*, 34 Ill. App. 3d 919, 921, 341 N.E.2d 129 (1976) (tainted evidence was admissible to impeach defendant's testimony that went beyond mere denial of committing offense); see also 6 W. LaFave, Search and Seizure (6th Ed. 2020) § 11.6 (a) (2), p. 534 ("a reasoned argument [can] be made to contain *Harris* and [to] preserve to some degree the opportunity of a defendant to deny the crime without fear of impeachment"). Second, some courts have limited the prosecution's use of tainted evidence to impeach the testimony of a defendant with respect to issues that the prosecution first raised on cross-examination. See, e.g., *United States* v. *Mariani*, 539 F.2d 915, 923–24 (2d Cir. 1976); *State* v. *Kidd*, 281 Md. 32, 47, 375 A.2d 1105, cert. denied, 434 U.S. 1002, 98 S. Ct. 646, 54 L. Ed. 2d 498 (1977). The present case did not involve a bare denial, and, although the point is arguable, I will assume for present purposes that the prosecution's use of the tainted evidence during cross-examination involved an issue that had been first introduced by the defendant on direct examination.

State *v.* Haynes

state may impeach a defendant's in-court testimony using a *noncontradictory*, though technically inconsistent, prior statement obtained illegally by the state.[4] See part I of the majority opinion. *Harris* and *Reid*—unlike the present case—involved impeachment using illegally obtained statements that directly contradicted the defendant's in-court testimony. See *Harris* v. *New York*, supra, 223; id., 226–27 (Brennan, J., dissenting); *State* v. *Reid*, supra, 650–52. The present case is, therefore, the first in which this court has been asked to decide whether we should adopt a more nuanced version of the impeachment exception to the exclusionary rule tailored to prevent the specific harm it is intended to prevent, i.e., perjury. See *Harris* v. *New York*, supra, 226 ("[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense").

The middle ground that I propose relies on what I believe is a fairer and more finely tuned balancing of the competing principles at stake in this case. On the one hand, there are fundamental interests of the highest magnitude weighing in favor of excluding from evidence the fruits of an illegal interrogation. If the rule of law means anything, it means that government actors, including police officers, must themselves adhere scrupulously to the constraints imposed on them by the law.[5]

---

[4] See 6 W. LaFave, Search and Seizure (6th Ed. 2020) § 11.6 (a) (4), pp. 536–37 ("The [United States] Supreme Court decisions permitting impeachment by use of illegally obtained evidence involved situations in which there was a clear conflict between the testimony of the defendant and that evidence. . . . [For example] in *Harris* the [defendant's] testimony was that the substance sold was baking powder while the evidence was [the] defendant's earlier statement to the police that the substance was heroin . . . .").

[5] See, e.g., *Trump* v. *United States*, 603 U.S. 593, 687, 144 S. Ct. 2312, 219 L. Ed. 2d 991 (2024) (Jackson, J., dissenting) ("[w]e have long lived with the collective understanding that '[d]ecency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen,' for '[i]n a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously' "), quoting *Olmstead* v. *United States*, 277 U.S. 438, 485, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Brandeis, J., dissenting); see also R. Fallon,

State *v.* Haynes

Desirable governmental ends do not justify unlawful governmental means. It is the responsibility of the judiciary in particular to ensure that the state does not subvert the fundamental purpose of the exclusionary rule, which is to deter governmental misconduct.[6] As Justice William J. Brennan, Jr., observed in his dissent in *Harris*: "[I]t is monstrous that courts should aid or abet the law-breaking police officer. It is [an] abiding truth that '[n]othing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence.' " Id., 232 (Brennan, J., dissenting), quoting *Mapp* v. *Ohio*, 367 U.S. 643, 659, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); cf. *State* v. *Dickson*, 322 Conn. 410, 429 n.11, 141 A.3d 810 (2016) ("to stand back and permit prosecutors and trial courts to engage in a practice that creates a significant risk that defendants will be deprived of their constitutional right to a fair trial would be an abdication of our constitutional duty"), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). This admonition may have greater force today than ever before, and law enforcement officers are not exempt from its application.

Second, and no less important, is a defendant's right to testify on one's own behalf. In *Rock* v. *Arkansas*, 483 U.S. 44, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987), the United States Supreme Court held that the right to testify in one's own defense was rooted "in several provisions of the [federal] [c]onstitution," including the due process clauses of the fifth and fourteenth amendments, the privilege against self-incrimination of the fifth amend-

" 'The Rule of Law' as a Concept in Constitutional Discourse," 97 Colum. L. Rev. 1, 8 (1997) (rule of law requires that "[t]he law should rule [all government] officials . . . as well as ordinary citizens").

[6] To this day, this court frequently hears cases involving allegations of such misconduct. In light of this first-hand experience, this court should have no doubt that the concerns animating the exclusionary rule remain present today. See part II D of this opinion.

Page 60

CONNECTICUT LAW JOURNAL

July 1, 2025

268

JULY, 2025

352 Conn. 236

State *v.* Haynes

ment, and the compulsory process clause of the sixth amendment. Id., 51; see id., 51–53; see also *United States* v. *Bifield*, 702 F.2d 342, 347–49 (2d Cir.) (tracing right from its origins in English common law to its firm establishment in American constitutional law and concluding that "the [centuries old] right granted an accused to be present and to be heard in person at a federal criminal trial may not be denied without violating the accused's [f]ifth and [s]ixth [a]mendment rights"), cert. denied, 461 U.S. 931, 103 S. Ct. 2095, 77 L. Ed. 2d 304 (1983); *State* v. *Morel-Vargas*, 343 Conn. 247, 256, 273 A.3d 661 (right to testify on one's own behalf is "[a] fundamental" constitutional right, "personal" to defendant, and "a necessary corollary to the [f]ifth [a]mendment's guarantee against compelled testimony" (internal quotation marks omitted)), cert. denied,      U.S.     , 143 S. Ct. 263, 214 L. Ed. 2d 114 (2022). The counterparts to these federal constitutional provisions can be found in article first, § 8, of the constitution of Connecticut. See *State* v. *Hobson*, 68 Conn. App. 40, 44, 789 A.2d 557 ("[a] defendant's right to testify is . . . protected by his rights to a fair trial, to due process, to present a defense, and to be free from compelled testimony under article XVII of the amendments . . . and . . . article first, § 8, of the Connecticut constitution" (internal quotation marks omitted)), cert. denied, 260 Conn. 910, 796 A.2d 557 (2002). The privilege against self-incrimination is "the hallmark of our democracy"; (internal quotation marks omitted) *Miranda* v. *Arizona*, supra, 384 U.S. 460; and is fulfilled only when defendants are able to exercise it or to speak in their own defense "in the unfettered exercise of [their] own will . . . ." *Malloy* v. *Hogan*, 378 U.S. 1, 8, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

On the other side of the balance is an important limitation on the defendant's constitutional right to testify, which is that there is no correlative right to testify

352 Conn. 236       JULY, 2025       269

State *v.* Haynes

falsely. See, e.g., *United States* v. *Apfelbaum*, 445 U.S. 115, 127, 100 S. Ct. 948, 63 L. Ed. 2d 250 (1980) ("the [f]ifth [a]mendment privilege against compulsory self-incrimination provides no protection for the commission of perjury"); see also *United States* v. *Havens*, 446 U.S. 620, 626, 100 S. Ct. 1912, 64 L. Ed. 2d 559 (1980) ("[w]e have repeatedly insisted that when defendants testify, they must testify truthfully or suffer the consequences"); *Oregon* v. *Hass*, 420 U.S. 714, 723, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975) (defendant has no "right to falsify free from the embarrassment of impeachment evidence from the defendant's own mouth"); *Harris* v. *New York*, supra, 401 U.S. 226 ("[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense"). As a consequence, the exclusionary rule prohibiting the government from using an illegally obtained statement should contain an exception permitting its use for impeachment purposes if the defendant presents the jury with directly contradictory testimony. In such a case, the jury should be alerted to the potentially perjurious testimony and permitted to compare it with the defendant's prior, contradictory version of events.[7]

---

[7] Of course, the fact that a defendant's prior statement contradicts his in-court testimony does not establish that the latter is perjurious. See *United States* v. *Thompson*, 808 F.3d 190, 194 (2d Cir. 2015) ("the federal criminal perjury statute, 18 U.S.C § 1621 . . . is violated if [a] witness testifying under oath or affirmation . . . gives false testimony concerning a material matter with the [wilful] intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory" (internal quotation marks omitted)); see also General Statutes § 53a-156 (a) (perjury occurs when "[a] person . . . in any official proceeding . . . intentionally, under oath . . . makes a false statement, swears, affirms or testifies falsely, to a material statement which such person does not believe to be true"). Scienter aside, a contradiction in the defendant's two versions of events does not establish which of the two is false. But at least the existence of a contradiction limits the possibilities; both versions cannot be true. Inconsistent statements, in contrast, can both be true; the discrepancy may be the result of a range of factors that often make any conclusions about falsity highly problematic. The inconsistency can result from omissions (or supplementations) caused by literal, contextual or other differences in the questions being answered

State *v.* Haynes

It is useful at this point to elucidate the critical distinction that animates the core difference between the majority's approach and my own. The majority would allow a testifying defendant to be impeached in the presence of the jury using any *inconsistent* statement obtained in an illegal interrogation, whereas I would apply the exclusionary rule under our state constitution to permit impeachment only if the tainted statement is *contradictory* to the defendant's trial testimony. Essential to my point is the fact that the law defines the term "inconsistency" very broadly to include far more than contradictory statements. See, e.g., *State* v. *Whelan*, 200 Conn. 743, 748–49 n.4, 513 A.2d 86 ("Inconsistencies may be shown not only by contradictory statements but also by omissions. . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in changes in position and they may also be found in denial of recollection. . . . The trial court has considerable discretion to determine whether evasive answers are inconsistent with prior statements." (Citations omitted.)), cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). A contradictory prior statement, by contrast, is one that cannot be true if the defendant's in-court statement is also true. I elaborate the significance of the distinction between an inconsistency and a contradiction for purposes of crafting a

(including the level of detail called for or provided), or can arise from misunderstandings of a wide variety, or from the universal reality that time is an invisible force that introduces change such that no two verbal recitals of the same event given by the same person on different occasions, often years apart, will be rendered in identical language and detail (unless the narrator memorizes the original script). The ultimate question for the court in the present context is what degree of discrepancy—contradiction or mere inconsistency—will be required before the defendant's testimony has opened the door to the prosecutor's use of illegally obtained evidence for the purpose of attacking the defendant's credibility.

sensibly balanced exclusionary rule throughout this opinion.

The issue in the present case is how our state constitution should balance the critical but competing interests at stake. The majority holds that we will adhere to the federal rule adopted by five justices of the United States Supreme Court in *Harris* v. *New York*, supra, 401 U.S. 222, and its progeny, because the defendant in the present case, Vernon Haynes, has not provided "inescapable" reasons to depart from its reasoning. (Internal quotation marks omitted.) Part I of the majority opinion. I strongly disagree that the *Harris* line of cases is binding precedent under the circumstances and reject the proposition that *Harris* provides the best legal framework to effectuate the important interests at stake. To the contrary, the doctrine enshrined in *Harris* is encumbered by multiple flaws, which become evident when the doctrine is applied in the present case. Specifically, the *Harris* doctrine (1) fails adequately to enforce the rule of law by allowing the state, far too readily, to take advantage of its agents' illegal conduct, (2) unduly inhibits defendants from freely exercising their constitutional right to testify at trial for fear of being impeached by technically inconsistent (but not contradictory) statements illegally obtained by the state, (3) too often relies on a lay jury to implement an esoteric and, in practice, largely illusory distinction between the use of evidence for substantive as opposed to impeachment purposes, and (4) creates an overbroad and poorly tailored exception to the exclusionary rule.

For these reasons, I believe that the middle ground approach I propose achieves the proper balance. It upholds the rule of law and enforces the deterrent effect underlying the exclusionary rule, pays due respect to defendants' constitutional right to testify at trial, and, at the same time, prevents defendants from testifying without consequence to facts that contradict their prior

State *v.* Haynes

statements, even if those statements were obtained illegally. I respectfully dissent from part I of the majority opinion.

I

RELEVANT FACTUAL AND PROCEDURAL
BACKGROUND

The basic underlying facts and procedural history are straightforward as they relate to the issue at hand. I will later provide, as they become relevant, a more detailed examination of the contents of the defendant's suppressed statement, his trial testimony, and the state's use of the former to impeach the latter.

On the morning of May 12, 2018, the defendant killed his girlfriend, took her car, and fled to New York. A few hours later, Waterbury police officers identified the defendant as a suspect, tracked him down, and alerted the New York City Police Department as to his whereabouts. New York City police officers arrested the defendant and transported him to a precinct in the Bronx. That same night, the Waterbury police traveled to the Bronx to interrogate the defendant. The Waterbury police began the interrogation by reading the defendant his *Miranda* rights, at which point the defendant said, "I need an attorney." (Internal quotation marks omitted.) In response, Detective Kyle Howles said: "Okay. . . . I mean, just so you understand . . . I can't ask you any more questions . . . . I know you probably have some explanation. You kinda already started to give me an explanation. I can't continue to talk to you without a lawyer present." The defendant, evidently influenced by these improper comments, kept talking to the police. During the approximately hour-long interrogation, the Waterbury police elicited a confession in which the defendant admitted to killing the victim.

State *v.* Haynes

The defendant moved to suppress his statement to the Waterbury police, claiming that he had invoked his right to counsel and that the Waterbury police had failed to cease questioning him. On the Friday before trial was scheduled to begin, the trial court held a hearing on the defendant's motion. After viewing a video recording of the police interview and hearing oral argument, the trial court found that the defendant had unequivocally invoked his right to counsel and that Detective Howles had improperly reinitiated the interrogation. The trial court therefore concluded that the defendant's statement to the Waterbury police had been obtained in violation of his *Miranda* rights and must be suppressed from the state's case-in-chief. However, the trial court also determined that the state was not precluded from impeaching the defendant's testimony with the suppressed statement, subject to the other applicable rules of evidence.

The prosecutor made it clear that he was both "surprise[d]" by the motion to suppress and "troubl[ed]" by the trial court's ruling. He immediately requested a six week continuance, explaining that he had been "relying on [the defendant's] statement . . . in [his] case-in-chief" and that the trial court's ruling had dealt the state's case "a significant blow." In light of the situation, the prosecutor insisted that he would need to call and prepare additional witnesses, conduct additional DNA testing, and obtain a psychiatric evaluation of the defendant. The trial court was understandably concerned by the request because a jury had already been selected, and trial was set to begin in a few days. When asked why the state had not raised these issues when the defendant had filed his motion to suppress two weeks earlier, the prosecutor "[c]andidly" admitted that, in his view, "[n]obody thought it would be granted." The court denied the state's request for a continuance, and the hearing ended with the prosecutor

State *v.* Haynes

lamenting that the ruling was "completely and exceedingly unfair to the state."

Three days later, at trial, the prosecutor admitted a large portion of the defendant's suppressed statement, albeit for impeachment purposes, and the prosecutor later emphasized those portions during closing argument before the jury. The prosecutor elicited testimony from the defendant on cross-examination and impeached the defendant's credibility by quoting extensively from his suppressed statement. Defense counsel objected to the prosecutor's use of the suppressed statement to impeach the defendant's in-court testimony, but the objection was overruled. The prosecutor proceeded repeatedly to insinuate through questioning that the defendant's in-court testimony was not credible by drawing attention to details contained in his suppressed statement that were either not included or presented in a slightly different sequence in his testimony at trial. Although the supposed inconsistencies between the defendant's illegally obtained statement and trial testimony did not include any contradictions and were not perjurious, this impeachment procedure nonetheless put the tainted evidence before the jury and undermined the defendant's credibility. See part III of this opinion.

I will return to the particulars of the state's use of the illegally obtained statement after setting forth what I consider to be the correct legal framework for analyzing the constitutional limitations on its use under our state constitution. Suffice it to say here that the underlying facts raise serious concerns that the prosecutor, "after having failed in [his] efforts to introduce the tainted evidence in [his case-in-chief]," was nonetheless able "to smuggle it in on cross-examination . . . ." *Walder* v. *United States*, 347 U.S. 62, 66, 74 S. Ct. 354, 98 L. Ed. 503 (1954). The *Harris/Reid* rule, which broadly permits the state to impeach the in-court testimony of a defendant on the basis of any minor deviation,

352 Conn. 236 JULY, 2025 275

State *v.* Haynes

inconsistency, or omission, too easily allows the state to do indirectly what it may not do directly: present a suppressed statement obtained in violation of a defendant's constitutional rights for the jury's consideration. In my view, such expansive and unconstrained use of evidence obtained in violation of constitutional norms should not be permitted, except to prevent the defendant from committing perjury at trial.

## II

### STATE CONSTITUTIONAL ANALYSIS

### A

I will not quarrel with the majority's conclusion that, for purposes of the federal constitution, this case is governed by the doctrine first articulated in the United States Supreme Court's decision in *Harris* v. *New York*, supra, 401 U.S. 222. The petitioner in *Harris* was charged with selling narcotics in violation of New York law and testified at trial, denying making any sales of narcotics. See id., 222–23. On cross-examination, the trial court allowed the state to impeach the petitioner's credibility by asking him about specific statements he had made to the police following his arrest that contradicted his testimony.[8] See id., 223. These statements were inadmissible in the prosecution's case-in-chief under *Miranda* because "no warning of a right to appointed counsel was given before questions were put to [the] petitioner when he was taken into custody." Id., 224. However, relying on *Walder* v. *United States*, supra, 347 U.S. 65, the court held that the unlawfully

---

[8] The defendant in *Harris* was charged with selling heroin to an undercover officer on two occasions. See *Harris* v. *New York*, supra, 401 U.S. 222–23. In his suppressed statement to the police, the defendant stated that he had twice purchased heroin from a third person in a controlled buy orchestrated by an undercover officer. See id., 227 (Brennan, J., dissenting). At trial, by contrast, he testified that he had not been involved in one of the sales at all and that he had sold the officer baking powder on the other occasion. See id., 226 (Brennan, J., dissenting).

State *v.* Haynes

obtained statements were admissible for purposes of impeachment. See *Harris* v. *New York*, supra, 224–26.

The court in *Harris* reasoned that "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury." Id., 225. The court, contra *Miranda*, appeared skeptical that the exclusionary rule served any useful purpose and, "[a]ssuming that the exclusionary rule [had] a deterrent effect on proscribed police conduct," dismissed out of hand extending it to prohibit the use of a defendant's suppressed statement for impeachment purposes. Id.; see id. ("sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its [case-in-chief]"). In the view of the *Harris* majority, "[t]he impeachment process . . . undoubtedly provided valuable aid to the jury in assessing [a defendant's] credibility, and the benefits of this process should not be lost . . . because of the speculative possibility that impermissible police conduct will be encouraged thereby." Id.

In a brief footnote, this court in *Reid* rejected the claim that it should depart from *Harris* and "adopt an absolute exclusionary rule as a matter of state constitutional law." *State* v. *Reid*, supra, 193 Conn. 655 n.11. The *Reid* footnote did acknowledge that "we have interpreted article first, § 8 of [the] Connecticut constitution to provide greater guarantees than its federal counterpart . . . ." (Citation omitted.) Id. This is itself striking, as *Reid* was decided in 1984, a relatively early stage in our court's history exploring the independent vitality of our state constitutional law. However, the court in *Reid* declined to recognize a more protective rule under the Connecticut constitution "in this instance" based on the unelaborated conclusion that it found the reasoning in *Harris* to be "persuasive . . . ." Id.

State *v.* Haynes

In the present case, the defendant argues that *Reid* is not dispositive because "[t]he court did not do a full analysis of the independent constitutional claim but simply adopted the rationale of *Harris* in a conclusory footnote." The majority acknowledges that the court in *Reid* "lacked the benefit of full briefing or analysis of the issue based on the now familiar factors articulated in *Geisler*, which was decided approximately eight years after *Reid*," but nonetheless declines to engage in a more robust analysis of the exclusionary rule under our state constitution.[9] Part I of the majority opinion. Instead, the majority asserts that "the advent of the *Geisler* analysis [did] not by itself diminish the precedential value of *Reid* as a matter of state constitutional law" because *Geisler* "did not purport to do anything more than collect from our prior state constitutional precedent certain tools of analysis [that] should be considered to the extent applicable . . . ." (Internal quotation marks omitted.) Id. The majority then applies a cursory *Geisler* analysis and concludes that, in line with stare decisis, there is no compelling reason to overrule or modify our holding in *Reid*. See id.

The majority's analysis of *Reid* and its putative stare decisis effect misses the point. The defendant does not, and could not, object to our failure to engage in a *Geisler* analysis nearly one decade before *Geisler* was decided.

_____

[9] In *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), "we identified six nonexclusive tools of analysis to be considered, to the extent applicable, whenever we are called on as a matter of first impression to define the scope and parameters of the state constitution: (1) persuasive relevant federal precedents; (2) historical insights into the intent of our constitutional forebears; (3) the operative constitutional text; (4) related Connecticut precedents; (5) persuasive precedents of other states; and (6) contemporary understandings of applicable economic and sociological norms, or, as otherwise described, relevant public policies." *State* v. *Santiago*, 318 Conn. 1, 17–18, 122 A.3d 1 (2015). "It is not critical to a proper *Geisler* analysis that we discuss the various factors in any particular order or even that we address each factor." (Internal quotation marks omitted.) *O'Shea* v. *Scherban*, 339 Conn. 775, 797, 262 A.3d 776 (2021).

State *v.* Haynes

The defendant's argument is that *Reid* did not engage in *any* independent constitutional analysis on this issue and, instead, adopted the *Harris* rule by "pronouncement . . . ." While I do not doubt the continued vitality of our pre-*Geisler* state constitutional precedent in general, I do question the majority's choice to rely on an unelaborated and wholly conclusory holding buried in a footnote more than forty years ago.

Even setting aside the perfunctory nature of the state constitutional holding in *Reid*, however, there is an independent and decisive reason that *Reid* cannot be deemed dispositive of the issue presented in this case. In *Reid*, as in *Harris*, the tainted statements were contradictory to, and not merely inconsistent with, the defendant's trial testimony.[10] As a result, the court in *Reid* was not asked to consider the defendant's claim in the present case, which is whether the impeachment exception to the exclusionary rule under our state constitution should permit *only* the use of illegally obtained statements that are contradictory to the defendant's in-court testimony, rather than merely inconsistent statements. The majority's reliance on the doctrine of stare decisis fails to address this critical distinction. Contradictory statements are, by definition, one type of inconsistent statement, so it was perfectly accurate for the court in *Reid*, applying the rule in *Harris*, to hold that the defendant's prior inconsistent statements obtained in violation of *Miranda* could be used to impeach his in-court testimony. See *State* v. *Reid*, supra, 193 Conn. 654–55. But it is a logical and legal mistake to conclude from that holding that *all* inconsistent statements, including *noncontradictory* statements, warrant the

---

[10] In *Reid*, the defendant previously had told police officers that he did not know the victims and had not been to the apartment where they were found dead, whereas, at trial, he testified that he had been at the scene of the crime and knew the victims. See *State* v. *Reid*, supra, 193 Conn. 650–51 and n.7.

352 Conn. 236 JULY, 2025 279

State *v.* Haynes

same treatment as an exception to the exclusionary rule. All contradictory statements are inconsistent, but not all inconsistent statements are contradictory. To the extent that the doctrinal formulation expressed in *Harris* and *Reid* can be read to include noncontradictory inconsistent statements, it is nonbinding dictum. See, e.g., *Kirtsaeng* v. *John Wiley & Sons, Inc.*, 568 U.S. 519, 548, 133 S. Ct. 1351, 185 L. Ed. 2d 392 (2013) ("[w]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated" (internal quotation marks omitted)); *Humphrey's Executor* v. *United States*, 295 U.S. 602, 627–628, 55 S. Ct. 869, 79 L. Ed. 1611 (1935) (rejecting, under stare decisis, dicta that "may be followed if sufficiently persuasive but [that] are not controlling"); see also *Hein* v. *Freedom from Religion Foundation, Inc.*, 551 U.S. 587, 615, 127 S. Ct. 2553, 168 L. Ed. 2d 424 (2007) ("It is a necessary concomitant of the doctrine of stare decisis that a precedent is not always expanded to the limit of its logic. . . . [In *Hein*] [w]e do not extend [prior precedent], but we also do not overrule it. We leave [prior precedent] as we found it."). In other words, holding in the defendant's favor in the present case does not require that we overrule *Reid*, and I do not advocate that result.

In my view, this case provides this court with an excellent opportunity to consider a refinement of the impeachment exception to the exclusionary rule as delineated in *Reid*. As I discuss more fully in part IV of this opinion, unlike in *Reid* (and *Harris*), the defendant's testimony in the present case was at most merely inconsistent with the statement that he gave to the Waterbury police on the day after the murder. For the reasons that follow, I would conclude that, under the relevant *Geisler* factors—our state law precedent, the policy considerations underlying the *Harris* line of cases, and the persuasive precedent of other state

State *v.* Haynes

courts—allowing the prosecution to impeach the defendant's in-court testimony with illegally obtained statements under these circumstances undermines the values and interests animating the exclusionary rule under our state constitution.

B

The majority does not address the strong support for the defendant's claim found in Connecticut case law. The constitutional rights of the accused, including the privilege against self-incrimination and the right to counsel, have been the subject of some of this court's most intense activity in our state constitutional law jurisprudence. Not infrequently, we have concluded that our state constitution provides greater protection of these rights than the federal constitution. Thus, in *State* v. *Stoddard*, 206 Conn. 157, 537 A.2d 446 (1988), we held that the Connecticut constitution requires the police to inform a suspect whom they are holding for custodial interrogation of timely efforts by counsel to render pertinent legal assistance. See id., 163, 166–67. The United States Supreme Court had rejected such a rule two years earlier on policy grounds; see id., 164; reasoning that, "[w]hile such a rule might add marginally to *Miranda*'s goal of dispelling the compulsion inherent in [a] custodial interrogation, overriding practical considerations counsel against its adoption." *Moran* v. *Burbine*, 475 U.S. 412, 425, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). In *Stoddard*, this court disagreed, recognizing the traditional and deeply rooted importance of the right to counsel in Connecticut. See *State* v. *Stoddard*, supra, 164 ("[t]his state has had a long history of recognizing the significance of the right to counsel, even before that right attained federal constitutional importance"). The same principles are plainly implicated in the present case because the *Miranda* violation arose when the police ignored the defendant's

State *v.* Haynes

unequivocal request for counsel and continued to question him for one hour following that request.

Our holding in *State* v. *Marsala*, 216 Conn. 150, 579 A.2d 58 (1990), while involving the fourth amendment exclusionary rule rather than the fifth amendment exclusionary rule, similarly reflects our commitment to policy considerations that properly incentivize the police to act within the bounds of the law in their investigative pursuits. See id., 159–60. In *Marsala*, this court considered whether our state constitution's prohibition on unreasonable searches and seizures contained the same good faith exception to the exclusionary rule that the United States Supreme Court had recognized in *United States* v. *Leon*, 468 U.S. 897, 905, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). See *State* v. *Marsala*, supra, 160–67. After extensively reviewing the policy considerations underlying *Leon*, this court stated that "[w]e simply [could not] accept the conclusion reached by the [court in] *Leon*"; id., 167; or "sanction a practice in which the validity of search warrants might be determined under a standard of 'close enough is good enough' instead of under the 'probable cause' standard mandated by article first, § 7, of our state constitution." Id., 171. We therefore concluded that the Connecticut constitution, unlike the federal constitution, does not contain a good faith exception to the fourth amendment exclusionary rule. Id. In so doing, we recognized that, "[i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States

State *v.* Haynes

Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." (Internal quotation marks omitted.) Id., 160.

More recently, in *State* v. *Purcell*, 331 Conn. 318, 320–21, 363–64, 203 A.3d 542 (2019), this court adopted a rule safeguarding access to counsel that was more protective than the one adopted by the United States Supreme Court in *Davis* v. *United States*, 512 U.S. 452, 459–60, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). *Davis* held that suspects must make a clear and unequivocal request for counsel in order to effectuate their right to have the police cease interrogation pursuant to *Edwards* v. *Arizona*, supra, 451 U.S. 483–85. See *State* v. *Purcell*, supra, 333. We rejected the federal rule as being inconsistent with the policies underlying *Miranda* and held that, under the Connecticut constitution, a custodial interrogation must cease if a suspect makes even an ambiguous invocation of his right to counsel. See id., 361–62. In *Purcell*, we reasoned that there was a lesser justification for deferring to federal law when "the question before us is not whether our state constitution provides a broader constitutional right than that afforded under the federal constitution" but "whether to adopt an additional layer of prophylaxis to prevent a significant risk of deprivation of those vital constitutional rights protected under *Miranda*."[11] (Emphasis omitted.)

[11] The majority asserts that its position is supported by "the prophylactic nature" of the rules prescribed in *Miranda* and *Edwards*. Part I of the majority opinion. I see it differently. The distinction we drew in *Purcell* was not intended to suggest that these prophylactic rules were severable from the underlying constitutional right. Despite the United States Supreme Court's vacillations and equivocations over the past three decades as to whether these rules are constitutional in nature, this court has consistently treated the *Miranda* based prophylactic rules as mandatory correlative requirements to ensure constitutional compliance. See, e.g., *State* v. *Dickson*, supra, 322 Conn. 427 n.11 ("the fact that a rule is designed to prophylactically prevent constitutional violations and is not itself constitutionally mandated in the

352 Conn. 236 JULY, 2025 283

State *v.* Haynes

Id., 342. Our reasoning was also rooted in principles of federalism; we acknowledged that, while the United States Supreme Court is constrained by federalism based concerns counseling in favor of the least prophylactic rule; see, e.g., *Moran* v. *Burbine*, supra, 475 U.S. 424–25, 428; each state can and should determine whether a more protective rule comports with its own laws and traditions. See *State* v. *Purcell*, supra, 343, citing T. Saylor, "Prophylaxis in Modern State Constitutionalism: New Judicial Federalism and the Acknowledged, Prophylactic Rule," 59 N.Y.U. Ann. Surv. Am. L. 283, 308–309 (2003).[12] We thus pointed to Connecticut's traditional

___

sense that nothing else will suffice to satisfy the constitutional requirements . . . does not mean that the rule does not have the force of a constitutional rule" (citation omitted; internal quotation marks omitted)); see also *State* v. *Purcell*, supra, 331 Conn. 342 ("It is important to underscore that the question before us is not whether our state constitution provides a broader constitutional *right* than that afforded under the federal constitution. . . . *Instead, the issue we decide is whether to adopt an additional layer of prophylaxis to prevent a significant risk of deprivation of those vital constitutional rights protected under* Miranda." (Citation omitted; emphasis altered.)). Not only have we determined that the *Miranda* rules are independently required under our state constitution, but we have also operated under the assumption that they are binding on this court under the federal constitution. See *State* v. *Mangual*, 311 Conn. 182, 185 n.1, 85 A.3d 627 (2014) (noting that United States Supreme Court "reaffirmed" that *Miranda* warnings "are constitutionally mandated").

[12] Other sources have made this federalism point, as well. See, e.g., R. Utter, "Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues When Disposing of Cases on State Constitutional Grounds," 63 Tex. L. Rev. 1025, 1042 n.115 (1985) ("Federalism considerations require the United States Supreme Court to find the lowest common denominator when it creates a new rule. . . . Due to the size and diversity of the country, the [c]ourt must limit its decisions to constitutional norms capable of achievement nationwide. The United States Supreme Court has recognized this limitation explicitly in *Argersinger* v. *Hamlin*, 407 U.S. 25, 27 n.1, 37 n.7 [92 S. Ct. 2006, 32 L. Ed 2d 530] (1972) . . . [and] *Mapp* v. *Ohio*, [supra, 367 U.S. 650–53]." (Citations omitted.)); see also *State* v. *Dukes*, 209 Conn. 98, 113, 547 A.2d 10 (1988) ("Although in interpreting the Connecticut constitution we have agreed with and followed the federal handling of consonant provisions of the federal constitution, this court has never considered itself bound to adopt the federal interpretation in interpreting the Connecticut constitution. Our system of federalism requires no less.").

State *v.* Haynes

commitment to the right to counsel and our precedent in *Stoddard* drawing on that tradition to determine the contours of the rights of a suspect during custodial interrogation. See *State* v. *Purcell*, supra, 345. We ultimately concluded that "the underpinnings of the [United States] Supreme Court's decision [were] so flawed or inconsistent with this state's case law or public policies that the decision should not be followed as a matter of state law." Id., 352; see id., 353.

This court's decisions in *Stoddard*, *Marsala*, and *Purcell* exemplify Connecticut's commitment to the essential role that the exclusionary rule plays in the enforcement of foundational constitutional principles. Of course, the present appeal would not require our time if *Stoddard*, *Marsala*, and *Purcell* had directly resolved the issue in the present case. They did not. Nonetheless, these cases are highly relevant to the *Geisler* analysis because they show that this court has not hesitated to examine the policy rationales underlying the United States Supreme Court's decisions regarding the scope of federal constitutional protections when determining the scope of our state constitutional protections, and to conclude that the Connecticut constitution is more protective. Our willingness to examine such underlying policy considerations in federal constitutional jurisprudence has been particularly evident in the area of the individual rights of the accused, and, with respect to *Stoddard* and *Purcell*, even more particularly in connection with safeguarding the right to counsel. I echo the majority's view that "a proper *Geisler* analysis does not require us simply to tally and follow the decisions favoring one party's state constitutional claim; a deeper review of [their] underpinnings is required because we . . . follow [only] persuasive decisions." (Internal quotation marks omitted.) Part I of the majority opinion. Here, our prior decisions demonstrate this court's long-standing and vigorous protection of the rights against self-incrimination, to counsel, and to due process under our state constitu-

352 Conn. 236 JULY, 2025 285

State *v.* Haynes

tion, beyond the baseline protection under the federal constitution, as established by the United States Supreme Court.

C

With these Connecticut cases in mind, I focus on the federal precedents that the majority chooses to follow and the various policy considerations that ultimately determine whether their reasoning is sufficiently persuasive to convince us to adopt the federal rule as our own. The majority finds particularly persuasive the majority opinions of the United States Supreme Court in *Harris* v. *New York*, supra, 401 U.S. 222, and *Oregon* v. *Hass*, supra, 420 U.S. 714.

I have already summarized the reasoning of the five member majority in *Harris*. In *Hass*, a majority of the court applied the same reasoning to reject the claim that the impeachment exception to the exclusionary rule should not apply when the police had informed the suspect of his *Miranda* rights, the suspect had requested an attorney, and the police had nonetheless continued the interrogation until the suspect's lawyer arrived, in violation of *Miranda*. See *Oregon* v. *Hass*, supra, 420 U.S. 714–15, 722–23. The majority declined to credit the respondent's argument that applying the exception in this situation would incentivize police misconduct because the police would have nothing to lose and everything to gain by continuing the interrogation, declaring in ipse dixit (as did the decision in *Harris*) that "there is sufficient deterrence when the evidence in question is made unavailable to the prosecution in its [case-in-chief]."[13] Id., 722.

[13] In *Hass*, the defendant's logic was that the police would remain deterred from questioning a suspect before providing the *Miranda* warnings because, at that point, there would still be a possibility that the suspect would waive his *Miranda* rights and provide an incriminating statement that would be admissible in the state's case-in-chief at trial. See *Oregon* v. *Hass*, supra, 420 U.S. 722. But, following a suspect's invocation of his *Miranda* rights, in the absence of an absolute exclusionary rule, there would be no incentive

State *v.* Haynes

As a starting point, I consider it important that the majority in both these cases emphasized that the primary purpose of the impeachment exception is to ensure that the defendant cannot commit *perjury* with impunity. See footnote 7 of this opinion. The point is significant because the United States Supreme Court has never suggested that the purpose of the impeachment exception is to allow the state to show that defendants' observational and narrative skills are less than ideal. Its purpose is to prevent defendants from lying without fear of contradiction by their own prior statements. In light of the competing interests served by the exclusionary rule, and in view of the exceptionally broad definition of the term "inconsistency" to include discrepancies that do not indicate perjury, an impeachment exception based on inconsistency alone is vastly overbroad and ill-suited to its stated purpose. Cf. *State v. Isom*, 306 Or. 587, 595, 761 P.2d 524 (1988) ("No one, including a criminal defendant, has the 'right' to give false testimony. Nor does anyone have the 'right' to commit murder or robbery. But all citizens, including criminal defendants, have constitutional rights . . . .").

Justice Brennan wrote incisive dissenting opinions in *Harris* and *Hass*. In *Harris*, Justice Brennan, joined by Justices William O. Douglas and Thurgood Marshall, contended that the majority's holding "goes far toward undoing much of the progress made in conforming police methods to the [c]onstitution." *Harris* v. *New York*, supra, 401 U.S. 232 (Brennan, J., dissenting). His criticism was not mild. As I previously discussed in this opinion, he emphasized the central importance of upholding the rule of law as applied to government officials. See id. Quoting *Miranda*, he also reminded us that the privilege against self-incrimination is the " 'essential mainstay' " of the American adversary sys-

for the police to cease the interrogation, as they could still possibly elicit statements to be used for impeachment purposes. See id.

State *v.* Haynes

tem. Id., 231 (Brennan, J., dissenting). The "values" underlying the right against self-incrimination, Justice Brennan said, "are plainly jeopardized if an exception against admission of tainted statements is made for those used for impeachment purposes." Id., 232 (Brennan, J., dissenting).

Justice Brennan's dissent in *Harris* also expressed concern about the way in which the majority's holding directly impacted the right of the accused to testify in one's own defense. "The prosecution's use of [a] tainted statement," he observed, "cuts down on the privilege [against self-incrimination] by making its assertion costly. . . . Thus, the accused is denied an unfettered choice when the decision whether to take the stand is burdened by the risk that an illegally obtained prior statement may be introduced to impeach his direct testimony denying complicity in the crime charged against him." (Citation omitted; internal quotation marks omitted.) Id., 230 (Brennan, J., dissenting). Justice Brennan's dissent in *Hass*, joined by Justice Marshall, renewed these objections with emphasis: "The [c]ourt's decision [in *Hass*] goes beyond *Harris* in undermining *Miranda*. Even after *Harris*, [the] police had some incentive for following *Miranda* by warning an accused of his right to remain silent and his right to counsel. If the warnings were given, the accused might still make a statement [that] could be used in the prosecution's [case-in-chief]. Under [*Hass*], however, once the warnings are given, [the] police have almost no incentive for following *Miranda*'s requirement that [i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present. . . . If the requirement is followed there will almost surely be no statement since the attorney will advise the accused to remain silent. If, however, the requirement is disobeyed, the police may obtain a statement [that] can be used for impeachment if the accused has the temerity to testify in his

State *v.* Haynes

own defense. Thus, after [*Hass*], if an individual states that he wants an attorney, police interrogation will doubtless be vigorously pressed to obtain statements before the attorney arrives.'' (Citation omitted; footnotes omitted; internal quotation marks omitted.) *Oregon* v. *Hass*, 420 U.S. 725 (Brennan, J., dissenting).

Reasonable minds may differ on the merits of these concerns when a defendant testifies in a manner that flatly contradicts a prior statement, as in *Harris* and *Hass*, thereby indicating a strong possibility of perjury. But the present case demonstrates why defendants would and should be extremely hesitant to exercise their constitutional right to testify at trial if the impeachment exception is extended to permit the state to use an illegally obtained statement to attack a defendant's credibility on the basis of mere inconsistencies between his trial testimony and the contents of his tainted statement. See part III of this opinion.

I find the dissenting opinions in *Harris* and *Hass* significantly more persuasive than their majority counterparts, and much more closely aligned with the watershed holdings in *Miranda* and *Edwards*. Those dissents also find substantial support in the scholarly literature, which has criticized the *Harris* line of cases on numerous grounds. To begin with, many commentators agree with Justice Brennan's observation in *Harris* that the use of illegally obtained evidence relating directly to the crime creates an unacceptable risk that the jury will impermissibly use such evidence to determine the defendant's guilt. See *Harris* v. *New York*, supra, 401 U.S. 231 (Brennan, J., dissenting) (''[a]n incriminating statement is as incriminating when used to impeach credibility as it is when used as direct proof of guilt'' (internal quotation marks omitted)). I consider it untenable and ill-advised to rely on a lay jury to safeguard the constitutional principles at stake on the basis of an elusive and ethereal distinction, particularly when the

State *v.* Haynes

defendant's testimony at trial does not contradict any-
thing he said in an illegally obtained prior statement. In
the words of one commentator, "[w]hen impeachment
evidence is . . . directly related to the charges at issue
and when, as in *Harris*, it corroborates the prosecu-
tion's version of relevant facts, there is a substantial
danger that a jury will ignore a limiting instruction and
not only conclude that the defendant may be lying,
but also draw the inference that the prior statement
is correct and therefore that the defendant is guilty."
Highlights of the Term, "Admissibility of Unlawfully
Obtained Statement for Impeachment Purposes," 85
Harv. L. Rev. 44, 48 (1971). Indeed, the futility of giving
a limiting instruction in this context has been widely
recognized.[14] In crafting a properly balanced exclusion-
ary rule, the court should be mindful of this risk and
minimize situations in which juries are placed in a
nearly impossible position. In my view, the proper bal-
ance would be to limit the impeachment exception to
cases in which the defendant's testimony directly con-
tradicts his illegally obtained prior statement.

---

[14] See *People* v. *Disbrow*, 16 Cal. 3d 101, 112, 545 P.2d 272, 127 Cal. Rptr.
360 (1976) ("[t]o instruct a jury that [it is] not to consider expressions of
complicity in the charged crime as evidence that the speaker in fact commit-
ted the charged crime, but only for the purpose of demonstrating that he
was probably lying when he denied committing the charged crime, would
be to require, in the words of [Judge] Learned Hand, 'a mental gymnastic
[that] is beyond, not only [the jury's] power, but anybody else's' "); M. White,
Comment, "The Impeachment Exception to the Constitutional Exclusionary
Rules," 73 Colum. L. Rev. 1476, 1476–77 (1973) ("[s]ince it is recognized
that it is virtually impossible for the trier of fact to restrain from considering
on the question of guilt evidence, legally relevant only to credibility, it
is important that the impeachment exception be contained within clearly
defined, narrow bounds if it is not to erode the constitutional rights protected
by the exclusionary rules" (footnote omitted)); see also 6 W. LaFave, Search
and Seizure (6th Ed. 2020) § 11.6 (a) (3), p. 536 (when tainted evidence that
bears directly on defendant's guilt has been used to impeach defendant's
testimony, "the risk that the jury will not, or cannot, follow instructions is
so great, and the consequences of failure so vital to the defendant, that the
practical and human limitations of the jury system cannot be ignored"
(internal quotation marks omitted)).

State *v.* Haynes

This brings me to the criticism of the *Harris* doctrine that I consider most compelling as applied to the present case. Judges and commentators alike have raised questions and expressed concern about the extent to which tainted evidence must contradict a defendant's testimony to be admissible for impeachment purposes. Professor Wayne R. LaFave points out that "[t]he [United States] Supreme Court decisions permitting impeachment by use of illegally obtained evidence involved situations in which there was a *clear conflict* between the testimony of the defendant and that evidence. In *Walder* the defendant testified [that] he had never possessed narcotics and the evidence was a heroin capsule seized from his home . . . [and] in *Harris* the testimony was that the substance sold was baking powder while the evidence was [the] defendant's earlier statement to the police that the substance was heroin . . . ." (Emphasis added.) 6 W. LaFave, Search and Seizure (6th Ed. 2020) § 11.6 (a) (4), pp. 536–37; see also *James* v. *Illinois*, 493 U.S. 307, 324–25, 110 S. Ct. 648, 107 L. Ed. 2d 676 (1990) (Kennedy, J., dissenting) (impeachment exception to exclusionary rule applies when "[the] triers of fact . . . were not just kept in the dark as to excluded evidence . . . but [were] positively misled," and such exception "can and should be confined to situations [in which] there is direct conflict, which is to say [when], within reason, the witness' testimony and the excluded testimony cannot both be true"). As one commentator has explained, when "the defendant's statement sought to be impeached is but an inferential denial of the impeaching evidence, found only through laborious study of [the] defendant's direct testimony, the evidence may not only be minimally, and therefore impermissibly, useful, but also may unconstitutionally chill [the] defendant's right to testify." (Internal quotation marks omitted.) M. White, Comment, "The Impeachment Exception to the Constitutional Exclusionary Rules," 73 Colum. L. Rev. 1476, 1488 (1973).

State *v.* Haynes

In line with these authorities, Maryland's highest court has held that the impeachment exception for statements taken in violation of *Miranda* "does not extend to the defendant's credibility generally, but to his specific credibility arising from a *realistic contradiction* between the issues he initiated on direct examination and the impeaching statement." (Emphasis added.) *State* v. *Kidd*, 281 Md. 32, 49, 375 A.2d 1105, cert. denied, 434 U.S. 1002, 98 S. Ct. 646, 54 L. Ed. 2d 498 (1977); see *State* v. *Franklin*, 281 Md. 51, 58, 375 A.2d 1116 (1977) (illegally obtained statement may be used at trial only "for the purpose of impeaching [the defendant's] credibility, not generally, but specifically with regard to a contradiction, reasonably inferred, between issues initiated by him on direct examination and the impeaching statement"), cert. denied, 434 U.S. 1018, 98 S. Ct. 739, 54 L. Ed. 2d 764 (1978); see also *Hall* v. *State*, 292 Md. 683, 688–89, 441 A.2d 708 (1982) (upholding use of illegally obtained statement to impeach defendant because it "directly contradicted" his testimony on direct examination); cf. *LeMasters* v. *People*, 678 P.2d 538, 543 (Colo. 1984) ("The sine qua non of impeaching a witness' testimony is that the evidence contradicts his previous statements. . . . In cases [in which] illegally seized evidence is admitted for impeachment purposes, the nexus between the defendant's statements and the contradictory evidence introduced on cross-examination must be apparent. . . . When the contradiction purportedly presented by the unconstitutionally obtained evidence is far from obvious, its value is speculative." (Citation omitted; footnote omitted.)).[15]

---

[15] Although I have not found any federal court of appeals decisions that have squarely addressed the distinction I elaborate in this opinion between a contradiction and an inconsistency, the First Circuit Court of Appeals has suggested that the impeachment of a defendant's trial testimony using illegally obtained statements "is governed by [the] common-law principles" of "impeachment by contradiction . . . ." (Citation omitted; internal quotation marks omitted.) *United States* v. *Morla-Trinidad*, 100 F.3d 1, 5 n.3 (1st Cir. 1996).

State *v.* Haynes

I am persuaded that the *Harris* model endorsed by the majority is seriously flawed because it allows the state to take substantial and unjustified advantage of its illegal conduct whenever the defendant's testimony omits (or includes) any details not contained in an illegally obtained prior statement. This overly broad application of the impeachment exception too readily abandons the role that the exclusionary rule serves in enforcing rule of law principles. It also prevents defendants from freely exercising their constitutional right to testify at trial without fear of impeachment by even the remotest inconsistency with an illegally obtained statement. And, when defendants testify directly about the criminal charges pending against them, the current impeachment exception leaves the jury with the well-nigh impossible task of considering the impact of the inconsistency on defendants' credibility without drawing substantive conclusions about defendants' criminal liability on those very charges.

In interpreting our own state constitutional provisions, this court is not bound by what we consider to be the flawed reasoning of federal constitutional precedent. See *State* v. *Cardenas-Alvarez*, 130 N.M. 386, 391, 25 P.3d 225 (2001) (state court may diverge from federal constitutional precedent in interpreting analogous provision of state constitution if, among other reasons, there is " 'a flawed federal analysis' "); *Morris* v. *Brandenburg*, 356 P.3d 564, 573 (N.M. App. 2015) (citing various state cases that rejected United States Supreme Court decisions because those decisions had been "widely criticized . . . [as] weakening a right beyond a point [that] may be countenanced under [the] state constitution," because they were "unpersuasive and incompatible with state constitutional standards," or because they were "devoid of a reasoned basis in constitutional doctrine" (internal quotation marks omitted)), aff'd, 376 P.3d 836 (N.M. 2016). We most certainly

State *v.* Haynes

are not bound to extend the imprecise language used in federal precedent to apply in circumstances that were not presented in the federal cases.[16] The *Harris* exception is overbroad and ill-suited to its truly legitimate justification, which is to prevent a defendant from committing perjury. That objective is best achieved by a rule permitting impeachment using prior contradictory statements as opposed to merely inconsistent ones.

D

The majority brushes aside the foregoing concerns without offering much in the way of counterarguments. The majority's position with respect to the deterrent effect of the exclusionary rule warrants particular attention. It contends that the defendant "has not established inescapable reasons that would compel us to overrule *Reid*'s holding that excluding illegally obtained evidence from the state's case-in-chief provides a sufficient deterrent effect to vindicate the prophylactic rules of *Miranda* and *Edwards*." Part I of the majority opinion. As an initial matter, as I pointed out previously in this dissenting opinion, the actual holding of *Reid* does not apply to this case, and adopting the rule that I propose would not require us to overrule *Reid*. The accurate characterization of the majority's opinion is that it chooses to extend the holding of *Reid* (and *Harris*) to now include noncontradictory but inconsistent prior statements. If we choose to extend the reasoning of *Reid* to the present case, we should do so only if that

[16] To be clear, I do not propose dispensing with the *Harris/Reid* impeachment exception altogether, as the Hawaii and Oregon Supreme Courts have done after concluding that their respective state constitutions prohibit the admission of a defendant's illegally obtained statement for any purpose, including impeachment. See *State* v. *Santiago*, 53 Haw. 254, 265–66, 492 P.2d 657 (1971) (prohibiting use of defendant's illegally obtained statement in prosecutor's case-in-chief or to impeach defendant's credibility, unless proper *Miranda* warnings are given); *State* v. *Isom*, supra, 306 Or. 594–95 (prohibiting, for impeachment purposes, use of statement obtained through interrogation after suspect has invoked right to counsel).

State *v.* Haynes

reasoning is persuasive. And to find persuasive the reasoning of footnote 11 in *Reid*, as it relates to the deterrence effect of the exclusionary rule, requires more imagination than I can muster. *Reid* never mentions the word deterrence, much less examines the unadorned and unreasoned declaration in *Harris* that the impeachment exception is "sufficient deterrence" of police misconduct. *Harris* v. *New York*, supra, 401 U.S. 225. I therefore take issue with the majority's premise that *Reid* represents binding precedent and contains reasoning that must be extended to the present case in the absence of inescapable reasons for declining to do so.

Upon examination, there are compelling grounds for refusing to extend any further than absolutely necessary the ipse dixit theory of deterrence set forth in *Harris*. To begin with, neither the majority nor the state provides any evidence whatsoever to support the proposition that the exclusion of illegally obtained evidence from the state's case-in-chief provides sufficient deterrence against police misconduct. If anyone knows the answer to that question, it would be the state, which works cooperatively with law enforcement officers and trains them with regularity on, among other things, the law governing interrogations and the exclusionary rule. See footnote 17 of this opinion. Yet, instead of facts about police misconduct and deterrence, we hear a repetition of the same ipse dixit employed by the majority in *Harris*. See *Harris* v. *New York*, supra, 401 U.S. 225 ("[a]ssuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its [case-in-chief]"). The *Harris* majority itself never provided any empirical evidence for this proposition; it was evidently based on the court's own assumptions about the information available to the police and their motivations, which may or may not have been accurate. See S. Stoughton,

State *v.* Haynes

"Policing Facts," 88 Tul. L. Rev. 847, 848–51 (2014) (discussing United States Supreme Court's common practice of making and relying on inaccurate factual assertions about policing); see also A. Larsen, "Factual Precedents," 162 U. Pa. L. Rev. 59, 60–66 (2013) (demonstrating that, once particular factual assertion has been made in United States Supreme Court opinion, it might be seen as particularly reliable in future and cited by lower courts).

Nor is it justifiable to assign the burden of proof to the defendant under these circumstances. After all, it is the government that has acted unlawfully by interrogating the defendant despite his request to talk to an attorney, and it is the government that seeks an exception to an exclusionary rule intended to deter such misconduct. It seems only fair to require the state to demonstrate in some meaningful fashion that the *Harris* impeachment exception to the exclusionary rule has no untoward impact on police behavior. I am skeptical of that hypothesis, particularly in light of the facts of the present case, which demonstrate how easy it is for the prosecution to accomplish indirectly, by way of impeachment, what it is prohibited from doing directly in its case-in-chief. In my view, it is not nearly enough for the state to summarily dismiss the defendant's arguments without providing any compelling evidence of its own, especially in view of the constitutional rights at stake. We should recall that the privilege against self-incrimination "reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of [a] crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for dis-

State *v.* Haynes

turbing him and by requiring the government in its contest with the individual to shoulder the entire load . . . our respect for the inviolability of the human personality and of the right of each individual 'to a private enclave where he may lead a private life . . . our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes a shelter to the guilty, is often a protection to the innocent." (Citations omitted; internal quotation marks omitted.) *Murphy* v. *Waterfront Commission of New York Harbor*, 378 U.S. 52, 55, 84 S. Ct. 1594, 12 L. Ed. 2d 678 (1964), overruled in part on other grounds by *United States* v. *Balsys*, 524 U.S. 666, 118 S. Ct. 2218, 41 L. Ed. 2d 575 (1998); see also *State* v. *Ferrell*, 191 Conn. 37, 41, 463 A.2d 573 (1983) ("[t]he [*Miranda*] warnings represent the belief, deep-seated in the Anglo-American legal tradition, that a person accused of a crime may be convicted only if exacting measures have been taken to [ensure] that the accused has been treated with the most scrupulous fairness by agents of the government").

While the state provides no evidence in support of its theory of nondeterrence, there is ample evidence to support the defendant's position that the deterrent effect of the exclusionary rule is reduced if there is an impeachment loophole. Legal scholars have documented the widespread police practice of questioning "outside *Miranda*," which refers to a variety of tactics used to elicit impeachment evidence from suspects after they invoke their *Miranda* rights. (Internal quotation marks omitted.) R. Leo & W. White, "Adapting to *Miranda*: Modern Interrogators' Strategies for Dealing with the Obstacles Posed by *Miranda*," 84 Minn. L. Rev. 397, 411 (1999); see id., 460–63 (describing strategies used by police to question outside *Miranda*); see also R. Leo, "Inside the Interrogation Room," 86 J. Crim. L. & Criminology 266, 276 (1996) (empirical study finding that, during custodial interrogations in which defendants invoked their *Miranda* rights, California police

State *v.* Haynes

officers continued to question outside *Miranda* in about one in five cases); E. Sanders, "Willful Violations of *Miranda*: Not a Speculative Possibility but an Established Fact," 4 Fla. Coastal L.J. 29, 37–54 (2002) (citing cases involving wilful violations of *Miranda* in Alabama, District of Columbia, Hawaii, Iowa, Kentucky, Maine, Minnesota, Nevada, New Mexico, Ohio, South Carolina, and Virginia); C. Weisselberg, "Saving *Miranda*," 84 Cornell L. Rev. 109, 136–38 and nn.146, 149, 151–52, 160 and n. 265 (1998) (citing cases documenting the deliberate practice of questioning outside *Miranda* in Arizona, California, Colorado, District of Columbia, Georgia, and Nebraska, as well as cases documenting *Miranda* violations in thirty-eight additional states).

Indeed, many commentators argue that the ongoing police practice of questioning defendants regardless of their *Miranda* invocations is a predictable result of the incentive structure created by the United States Supreme Court in *Harris* and its progeny. See, e.g., *State* v. *Isom*, supra, 306 Or. 595 ("far from discouraging the police, the federal rule . . . actually encourages unconstitutional interrogation [when] the suspect has taken the police at their word and declined to talk"); S. Clymer, "Are Police Free To Disregard *Miranda*?," 112 Yale L.J. 447, 507 (2002) ("a police officer faced with a suspect's assertion of rights has little to lose, and possible impeachment evidence to gain, by continuing [an] interrogation despite the *Miranda* rules"); C. Steiker, "Counter-Revolution in Constitutional Criminal Procedure? Two Audiences, Two Answers," 94 Mich. L. Rev. 2466, 2525 (1996) (calling the *Harris* impeachment exception "[an] obvious incentive for police misconduct"); S. Thompson, "Evading *Miranda*: How *Seibert* and *Patane* Failed To 'Save' *Miranda*," 40 Val. U. L. Rev. 645, 670 (2006) ("[t]he cumulative effect of the [United States Supreme] Court's jurisprudence has been to free interrogators to obey or disobey *Miranda*'s stric-

State *v.* Haynes

tures depending on the balance of advantages and disadvantages''). The United States Supreme Court has also foreclosed any civil liability for deliberate police violations of *Miranda* under 42 U.S.C. § 1983, further reinforcing this undesirable incentive structure. See *Chavez* v. *Martinez*, 538 U.S. 760, 772–73, 123 S. Ct. 1994, 155 L. Ed. 2d 984 (2003).

It stands to reason that police officers, like many other social actors subject to rules designed to discourage violations of the law, would respond to incentives created by judicial precedent. Police officers regularly receive training on constitutional criminal procedure, including the exclusionary rule.[17] See C. Steiker, supra, 94 Mich. L. Rev. 2534–35. In this training, "the police are very apt to 'hear' the decision rules that the [United States] Supreme Court makes (and that lower federal and state courts apply) and thus to adjust their attitudes about what behavior 'really' is required by the [c]ourt's conduct rules.'' Id., 2534. In at least some instances, police training even implicitly encourages officers to continue questioning defendants after they invoke their *Miranda* rights. See, e.g., C. Weisselberg, "Mourning *Miranda*," 96 Cal. L. Rev. 1519, 1554 (2008) (quoting training material from Los Angeles County District Attorney's Office, stating that "custodial interrogation without *Miranda* waivers does *not* violate the [c]onstitution, does *not* violate the *Miranda* evidentiary rule, and does *not* constitute deterrable misconduct," and that statements obtained in such manner may "legitimate[ly]" be used to "[i]mpeach inconsistent trial testimony" (emphasis in original; internal quotation marks omitted)). It is therefore the obligation of the judiciary

---

[17] In Connecticut, the Office of the Chief State's Attorney confirmed this to be the case most recently on March 5, 2025, at oral argument in *State* v. *Correa* (SC 20728), when it assured the court that the Connecticut Division of Criminal Justice gives "extensive trainings" approximately "seven times a year" to educate police officers about the law governing searches and seizures.

State *v.* Haynes

to exercise caution in making exceptions to constitutional protections and to ensure that any exceptions are thoughtfully tailored to their respective purposes.

The majority, in my view, dismisses too readily the defendant's argument that the overbroad *Harris* impeachment exception encourages police misconduct. It observes that, in the multistate survey cited by the defendant cataloging intentional *Miranda* violations between 1981 and 1996, the author found no instances of intentional violations in Connecticut. See footnote 10 of the majority opinion; see also E. Sanders, supra, 4 Fla. Coastal L.J. 37 n.68. This observation is correct as a literal matter, but it should provide no comfort in connection with the issue before us. The survey examined only decisions that (1) were issued more than twenty-five years ago, (2) expressly cited *Edwards* v. *Arizona*, supra, 451 U.S. 477, (3) were issued in cases that went to trial, and (4) involved *Miranda* violations found to have been wilful. See E. Sanders, supra, 37 n.68. This is hardly a useful sample of cases from which we can draw any reliable conclusions about the efficacy of the exclusionary rule in Connecticut, and the study itself did not claim to provide a comprehensive quantitative analysis.[18] In fact, a nonexhaustive review of Connecticut cases over the past thirty years reveals more than a few instances of *Miranda* based violations under both the federal and state constitutions. See, e.g., *State* v. *Culbreath*, 340 Conn. 167, 188–91, 263 A.3d 350 (2021) (police failed to stop and clarify after defendant's equivocal invocation of right to counsel in violation of Con-

_____

[18] Indeed, it would be virtually impossible to determine the number of *Miranda* violations in a given state judging solely by the record of cases that go to trial, as the vast majority of criminal cases are disposed via plea agreement. See, e.g., Connecticut Judicial Branch, "Judicial Branch Statistics: Movement of Criminal Docket July 1, 2023, to June 30, 2024," available at https://jud.ct.gov/statistics/criminal/Crim_JD_2024.pdf (last visited June 20, 2025) (less than 5 percent of criminal, nonmotor vehicle cases disposed of in Connecticut in 2023 fiscal year went to judgment after trial).

State *v.* Haynes

necticut constitution); *State* v. *Gonzalez*, 302 Conn. 287, 291–92, 23 A.3d 648 (2011) (police told defendant that it was his "opportunity to talk to them and to tell his side of the story" without first providing *Miranda* warnings); *State* v. *Maharg*, Superior Court, judicial district of Danbury, Docket No. DBD-CR19-0159438-S (October 31, 2022) (finding violation of both *Miranda* prophylactic rule and federal due process rights when police failed to stop thirteen hour interrogation, despite defendant's invocation of right to counsel and repeated requests to terminate questioning while he was experiencing severe alcohol withdrawal symptoms, culminating in defendant's hospitalization), appeal filed, Connecticut Supreme Court, Docket No. SC 20855 (July 17, 2023); *State* v. *Pinder*, Docket No. CR-94-090398, 1997 WL 260938, *5 (Conn. Super. May 12, 1997) (police took written statement from defendant in custody after defendant said, " '[y]eah, but I want a lawyer' "), aff'd, 250 Conn. 385, 736 A.2d 857 (1999); *State* v. *Saraceno*, Superior Court, judicial district of Middlesex, Docket No. CR-94-130274 (September 19, 1995) (15 Conn. L. Rptr. 169, 178) (police continued custodial interrogation of defendant after he invoked his right to counsel). I simply do not accept the majority's suggestion that such things do not happen here or occur with such infrequency in Connecticut that our exclusionary rule jurisprudence need not bother to address the concern. *Miranda* violations can and do happen in Connecticut, and we must take steps to ensure that they do not undermine the protections enshrined in article first, § 8, of the Connecticut constitution. I am similarly unpersuaded by the majority's reliance on the fact that the *Miranda* violation in this case was unintentional and, therefore, not deterrable. See footnote 10 of the majority opinion. An effective exclusionary rule would promote systemic deterrence by incentivizing law enforcement officers to be more careful and by promoting greater conformity with the

State *v.* Haynes

law on an aggregate level. See, e.g., D. Gray, "A Spectacular Non Sequitur: The Supreme Court's Contemporary Fourth Amendment Exclusionary Rule Jurisprudence," 50 Am. Crim. L. Rev. 1, 27 (2013) ("The real target for deterrence is not the individual officer, but law enforcement agencies of which they are a part. By compromising overall governmental efforts to prosecute and punish offenders, the exclusionary rule creates strong incentives for those agencies to train police officers."); cf. *State* v. *Marsala*, supra, 216 Conn. 170–71 ("[The exclusionary rule is] designed to deter future police misconduct and [to] ensure, as nearly as can be, institutional compliance with . . . our state constitution. . . . [I]f the overall educational effect of the exclusionary rule is considered, application of the rule to even those situations in which individual police officers have acted on the basis of a reasonable but mistaken belief that their conduct was authorized can still be expected to have a considerable long-term deterrent effect. If evidence is consistently excluded in these circumstances, police departments will surely be prompted to instruct their officers to devote greater care and attention to [proper constitutional procedure] . . . ." (Citation omitted; internal quotation marks omitted.)). For all of these reasons, I would conclude that the state constitution allows for the application of the impeachment exception only when the evidence obtained in violation of *Miranda* and *Edwards* directly contradicts the defendant's trial testimony.

## III

### THE ILLEGALLY OBTAINED EVIDENCE WAS INADMISSIBLE FOR IMPEACHMENT PURPOSES UNDER THE STATE CONSTITUTION, AND ALLOWING ITS USE WAS HARMFUL ERROR

Applying these principles to the present case, I would conclude that the trial court erred in admitting the

State *v.* Haynes

defendant's suppressed statement to impeach his trial testimony. By my count, the prosecution used more than twenty parts of the suppressed statement to attack the defendant's credibility. Not a single one of those excerpts contradicted the defendant's testimony at trial. As a result, not a single part of the defendant's suppressed statement was properly admitted. I would further conclude that this error was not harmless and remand the case for a new trial.

A

The following additional facts are relevant to my analysis. The defendant's evidence at trial consisted solely of his own testimony, which was presented in support of his affirmative defense that he was acting under the influence of an extreme emotional disturbance at the time he caused the victim's death. See General Statutes §§ 53a-54a (a) and 53a-55 (a) (2). The defendant's testimony on direct examination was brief, less than six pages in the trial transcript, and his answers were responsive to his attorney's questions. He did not go into extensive detail or attempt to provide an exhaustive sequence of events. The defendant testified about his Rastafarian religion and its role in his life. In particular, he referred to his dreadlocks as his "natural baptism," his "crown, which [he] carr[ies] every single day upon [him]," and his "vow . . . ." At the time of trial in 2022, he had been growing his dreadlocks for more than twenty years as part of his "dedication toward God." In addition, he testified that he had been romantically involved with the victim since 2017, and that he "loved her with [his] whole entire heart." Finally, he described the argument on May 12, 2018, during which he killed the victim. He testified that the argument began because he refused to give the victim money to purchase drugs, after which she pressed a key into his side, jammed a comb into his ear, swung scissors toward his face, and yanked hair from out of his head, threatening to cut it

State *v.* Haynes

all off. The defendant testified that, when the victim pulled out his dreadlocks, he went "to another emotional state" and had "to protect what [he had] vow[ed] to keep . . . ." He then proceeded to hit and stab her, although he testified that he did not remember the incident "in complete full details because, mentally, [he] lost [his] mind."

In contrast to the defendant's testimony at trial, the interrogation conducted by the Waterbury police four years earlier covered the entire sequence of events in elaborate detail. The interrogation lasted almost one hour, during which two police officers asked numerous follow-up questions to elicit information for the purpose of their investigation. The officers' questions were not the same as—and, indeed, were much more probing than—those later posed to the defendant by his attorney in the courtroom. Also, unsurprisingly, the defendant did not cover nearly as much ground in response to his attorney's questions in court as he had in the interrogation room; nor did he use the exact same language. These discrepancies, if they can be called that, would be expected in most cases because the two contexts are different; no deceptive intent can be inferred from the fact that the defendant's trial testimony was far briefer and more narrowly focused than his lengthy, meandering statement to the Waterbury police four years earlier.

It should not go unnoticed, moreover, that one other crucial difference between the interrogation and the trial was that the defendant was denied access to counsel when he gave his statement to the police, whereas his attorney was not only present but acted as his interlocutor during direct examination. In fact, this difference is the very reason that the interrogation statement was tainted by illegality and suppressed as evidence at trial. It would be deeply ironic under these circumstances if we permitted the jury to examine the state-

304 JULY, 2025 352 Conn. 236

State *v.* Haynes

ment for purposes of assessing the defendant's credibility on the basis of anything less than direct contradictions between the two sets of answers. Such a procedure allows the state to take advantage of the precise violation that required suppression in the first place. If the police had duly observed constitutional principles by honoring the defendant's request for counsel, the presence of counsel in any subsequent interrogation would have mitigated the risk of confusion, imprecision, or the other distortive factors giving rise to a later claim of inconsistency.[19] In cases involving a violation of a defendant's right to counsel, then, it is fair and appropriate to hold that any noncontradictory discrepancies between the defendant's illegally obtained statement and trial testimony do not demonstrate deception but, instead, reflect the critical role of counsel in protecting the constitutional rights of the accused. See *Miranda* v. *Arizona*, supra, 384 U.S. 469 ("the right to have counsel present at the interrogation is indispensable to the protection of the [f]ifth [a]mendment privilege under the system we delineate today").

B

The major defect in the *Harris* doctrine, as applied to the facts of this case, is that it allows for the use of illegally obtained evidence upon a mere showing that a defendant's prior statement is inconsistent with his trial testimony, setting a remarkably low bar for the use of evidence obtained by the unlawful conduct of government officials. Cf. *State* v. *Whelan*, supra, 200

---

[19] "An attorney may advise his client not to talk to [the] police until he has had an opportunity to investigate the case, or he may wish to be present with his client during any police questioning. In doing so an attorney is merely exercising the good professional judgment he has been taught. This is not cause for considering the attorney a menace to law enforcement. He is merely carrying out what he is sworn to do under his oath—to protect to the extent of his ability the rights of his client. In fulfilling this responsibility the attorney plays a vital role in the administration of criminal justice under our [c]onstitution." *Miranda* v. *Arizona*, supra, 384 U.S. 480–81.

State *v.* Haynes

Conn. 748–49 n.4 (discussing broad nature of inconsistencies that trigger right to impeach witness). The vast majority of the excerpts from the defendant's suppressed statement used by the prosecutor in this case were noncontradictory details that the defendant had provided during his discursive interrogation but omitted in his shorter and more focused trial testimony. By my count, impeachment of this nature was permitted fourteen times during the prosecutor's cross-examination.

Two examples will illustrate the pattern of impeachment that I consider improper. In one instance, defense counsel asked the defendant on direct examination if he had "hit" the victim. The defendant answered, "[y]es." During cross-examination, the prosecutor asked the defendant if he remembered telling the Waterbury police that he had "hit [the victim] in the face." The defendant answered, "[y]es." The state presumably defends this line of questioning as permissible under *Harris* and *Reid* because the defendant's omission of the detail about *where* he struck the victim was technically an inconsistency under our law of prior inconsistent statements. But the use of this omitted detail did nothing to alert the jury to any potential perjury. The defendant was never asked on direct examination about where he struck the blow, presumably because it was not of any particular relevance to his defense of extreme emotional disturbance. Nothing in the defendant's prior statement to the Waterbury police that he had "hit [the victim] in the face" contradicted or cast any doubt on the truth of his testimony that he had "hit" the victim. The prosecution, in other words, used illegally obtained evidence to plant in the jurors' minds the idea that the defendant was not credible, without any showing that his prior statement contradicted his trial testimony.

In a similar instance involving impeachment by a noncontradictory omission, the prosecutor asked the

State *v.* Haynes

defendant, "[d]o you recall telling the police that [the victim], during the fight, was yelling at the top of her lungs?" The defendant answered, "[y]es, I do believe so." This impeachment occurred notwithstanding the fact that the defendant did not testify on direct examination about whether the victim was yelling and said nothing in court to contradict his statement to the police in this regard. But, under the *Harris/Reid* rule, this prior statement evidently was admissible for impeachment purposes. I have not yet heard any good reason explaining why that is so. My view is that a robust exclusionary rule that protects the fundamental constitutional rights of the accused should not be so easily circumvented by an impeachment exception far broader than that which is required to prevent or expose perjury.[20]

Indeed, the incautious and relatively unconstrained approach of the prosecutor's cross-examination of the defendant in using his suppressed statement, which the majority characterizes as an "explor[ation] [of] a variety of inconsistencies," resulted in numerous instances in which the impeachment was impermissible even under the *Harris/Reid* rule, properly applied. Part I of the majority opinion. Although the term "inconsistency" for purposes of impeachment is a broad category, the state still must be able to show that a witness' prior inconsistent statement was, in fact, "inconsistent" with the witness' testimony. See, e.g., *State* v. *Richardson*, 214

---

[20] The foregoing are only two of many instances of impeachment by noncontradictory portions of the defendant's prior statement. Other instances of impeachment involved inconsistencies regarding the victim's pulling the defendant by his shirt; the defendant's pushing the victim onto the bed; the defendant's wrestling with the victim for the scissors; the victim's scratching the defendant's arms and body; the defendant's yelling "fire," blacking out, and putting his hands around the victim's neck; the defendant's hearing the victim "gurgle" blood and seeing blood spurt out; the defendant's seeing the victim's arms and body go limp; the defendant's stabbing the victim specifically in the neck; the defendant's showering; the defendant's taking of the victim's wallet; the defendant's getting food after the incident; and the neighbor's walking of his dog at the time of the incident.

State *v.* Haynes

Conn. 752, 763–64, 574 A.2d 182 (1990). In the present case, the prosecutor purported to impeach the defendant with several portions of his suppressed statement that were not inconsistent with, much less contradicted by, his testimony at trial.[21] This further misuse of the suppressed statement, in my view, is a direct consequence of the lack of vigilance engendered by the anemic standard adopted in *Harris* and *Reid*.

The standard methodology for impeaching a witness with a prior inconsistent statement involves laying a foundation, identifying the precise inconsistency to be impeached, requesting a limiting instruction from the court as to the specific statement being used for impeachment purposes, and only then proceeding to introduce the statement. See, e.g., E. Imwinkelried, Evidentiary Foundations (12th Ed. 2023) § 5.09 (2), pp. 253–54. This methodology is preferred because it puts defense counsel on notice of each portion of the suppressed statement to be used, enables the trial court to understand the precise claim of inconsistency and to determine whether the state has made the requisite showing, and facilitates appellate review. However, the traditional procedure is not mandatory in every instance, and the trial court retains broad discretion to admit

---

[21] In one such instance, after the defendant testified at trial that the victim had pressed her car key into his "side," the prosecutor purported to impeach him with his suppressed statement that she had pressed her car key into his "back." But the defendant had actually said in his suppressed statement that the victim had pressed her car key into both his back and side, such that the purported inconsistency did not exist. In another instance, the prosecutor purported to impeach the defendant by asking if he recalled telling the Waterbury police that, when the victim pulled out his hair, he was "laying down in bed trying to be the nice guy" and was not "enraged at all." The prosecutor then asked the defendant: "Here, you're testifying [that] she pulled out your hair that day, [that] you flew into a rage. [In your prior statement], you're saying [that] you weren't [in a rage]." But, in fact, the defendant never said in the suppressed statement that he was "trying to be the nice guy," and he never said in his trial testimony that he "flew into a rage," such that, again, the purported inconsistency did not exist.

State *v.* Haynes

impeaching statements when no foundation has been laid.[22] Whatever the rule is generally, it is vitally important that the standard methodology be followed in cases involving impeachment using an illegally obtained statement. The stakes are too high for shortcuts. In the absence of the vigilant attention of the trial court, defense attorney, and prosecutor, including a rigorous comparison of the defendant's prior statement and trial testimony, the risk of improper impeachment is ever-present. Prior statements that are not actually inconsistent with the defendant's trial testimony but nonetheless lead a jury to falsely suspect that the defendant has told several versions of the same story, can slip through on cross-examination. That occurred in this case. As a consequence, the jury was permitted to hear numerous parts of the defendant's suppressed statement that demonstrated no inconsistency, much less contradiction, with his in-court testimony.

C

Having determined that the trial court improperly permitted the prosecution to make use of extensive noncontradictory portions of the defendant's suppressed statement for impeachment purposes, the remaining question is whether the error was harmless. When, as here, an evidentiary error is of constitutional proportion, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. See, e.g., *State* v. *Mangual*, 311 Conn. 182, 214, 85 A.3d 627 (2014). This is a demanding standard. "[W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence *may have had a tendency to influence the judgment of the jury*, it cannot

_____

[22] See *State* v. *Saia*, 172 Conn. 37, 46, 372 A.2d 144 (1976) ("[i]n this state, we have no inflexible rule regarding the necessity of calling the attention of a witness on cross-examination to his alleged prior inconsistent statements before either questioning him on the subject or introducing extrinsic evidence tending to impeach him"); see also Conn. Code Evid. § 6-10.

State *v.* Haynes

be considered harmless.'' (Emphasis added; internal quotation marks omitted.) Id.; see also *State* v. *Sayles*, 348 Conn. 669, 682, 310 A.3d 929 (2024) (''the test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained'' (internal quotation marks omitted)).

The determination of whether an evidentiary error was harmless ''depends on a number of factors, such as the importance of the evidence to the state's case, whether the evidence was cumulative of properly admitted evidence, the presence or absence of corroborating evidence, and, of course, the overall strength of the state's case.'' (Internal quotation marks omitted.) *State* v. *Alexander*, 343 Conn. 495, 506, 275 A.3d 199 (2022). We also ''consider the centrality of that evidence at trial and the number and frequency of references to the wrongly admitted evidence.'' *United States* v. *Cummings*, 858 F.3d 763, 778 (2d Cir. 2017); cf. *State* v. *Brown*, 345 Conn. 354, 385, 285 A.3d 367 (2022) (frequency of improper conduct is one factor considered in assessing harmfulness of prosecutorial impropriety). Our analysis similarly assesses ''how the state used [the inadmissible] evidence in its closing argument.'' *State* v. *Ayala*, 333 Conn. 225, 235, 215 A.3d 116 (2019); see also *State* v. *Culbreath*, supra, 340 Conn. 195 (''[t]he state's frequent and repeated emphasis on the defendant's inadmissible statements during its closing and rebuttal arguments indicat[ed] that their admission was not harmless''); *State* v. *Sawyer*, 279 Conn. 331, 360–61, 904 A.2d 101 (2006) (prosecutor's repeated referral to improperly admitted evidence in closing argument supported conclusion that error was not harmless), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008). Additionally, it is well established that, when credibility is at issue in a case, ''an error affecting the jury's ability to assess a [witness']

State *v.* Haynes

credibility is not harmless error.'' (Internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 223–24, 202 A.3d 350 (2019); see also *State* v. *Culbreath*, supra, 193–200 (reliance on defendant's inadmissible statements as impeachment evidence was not harmless when defendant's credibility was critical to his self-defense claim).

As an initial matter, the harmless error analysis in the present case *does not* implicate the jury's consideration of whether the defendant was responsible for the victim's death. There was no question that he killed the victim; he never contested that fact at trial.[23] The sole disputed issue before the jury was whether the defendant could prove his affirmative defense of extreme emotional disturbance under § 53a-54a (a). To meet his burden of proof, the defendant would have had to "demonstrate by a preponderance of the evidence that he had caused the death of the [victim] under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse measured from the viewpoint of a reasonable person in the defendant's situation under the circumstances as the defendant believed them to be." (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 510, 180 A.3d 882 (2018). To determine that the defendant had indeed suffered from an extreme emotional disturbance, the jury was required to find that "(a) the emotional distur-

---

[23] For this reason, the majority's characterization of the defendant's claim, namely, "that article first, § 8, of the Connecticut constitution precluded the state from using his confession . . . to impeach his trial testimony," is inaccurate. (Footnote omitted.) Part I of the majority opinion. The crux of the defendant's claim is that his illegally obtained statement was used to impeach his credibility on the basis of what were, at best, noncontradictory inconsistencies with his trial testimony, thereby impermissibly chilling his right to testify in his own defense. The majority's narrow framing of the defendant's claim as primarily concerned with his confession sidesteps his broader claim regarding the proper balance of the exclusionary rule under our state constitution.

State *v.* Haynes

bance [was] not a mental disease or defect that rises to the level of insanity as defined by the Penal Code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions.'' (Internal quotation marks omitted.) Id., 536; accord *State* v. *Ames*, 171 Conn. App. 486, 494, 157 A.3d 660, cert. denied, 327 Conn. 908, 170 A.3d 679 (2017). The jury would also have had to consider "whether the intensity of [the defendant's] feelings was such that his usual intellectual controls failed and the normal rational thinking for that individual no longer prevailed at the time of the act.'' (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 536.

Had the jury been persuaded by the defendant's extreme emotional disturbance defense, he would not have been convicted of murder and instead would have been criminally liable only for manslaughter in the first degree. See General Statutes §§ 53a-54a (a) and 53a-55 (a). To establish that the error at issue was harmless, therefore, the state must demonstrate beyond a reasonable doubt that the improper admission of the tainted evidence did not tend to influence the jury's decision regarding the defendant's extreme emotional disturbance defense. Although it is a close case, I do not believe that the state can meet this high burden.

The defendant's credibility was plainly critical to his defense theory. The only evidence presented in support of his affirmative defense was his own testimony describing his Rastafarian religion, the importance of his dreadlocks to his faith, and his experience of "los[ing] [his] mind'' after the victim threatened to cut off his hair. There were no psychiatric reports or expert testimony

State *v.* Haynes

documenting the defendant's mental condition, no expert testimony describing the importance of dreadlocks in the Rastafarian religion, and no other evidence, expert or otherwise, to help the jury decide whether a reasonable person in the defendant's situation would have experienced an extreme emotional disturbance. Consequently, his affirmative defense relied entirely on the persuasive strength of his own testimony, which, in turn, depended on his credibility before the jury.

In the impeachment context, even the most minor inconsistencies can raise questions in the jurors' minds about a witness' credibility. See 1 R. Mosteller et al., McCormick on Evidence (8th Ed. 2020) § 34, p. 256 ("The attack by prior inconsistent statement is not based on the theory that the present testimony is false and the former statement true. Rather, the theory is that talking one way on the stand and another way previously is blowing hot and cold, raising a doubt as to both statements."). The prosecutor therefore struck a major blow to the defendant's credibility when he was permitted to inform the jury of more than twenty inconsistencies between the defendant's suppressed statement and his testimony at trial. Although there was no evidence of perjury, the very fact of these inconsistencies could have led a reasonable jury to doubt the defendant's credibility. This doubt alone may well have been fatal to the defendant's affirmative defense.

In addition to casting doubt on the defendant's testimony in general, the prosecutor specifically targeted his credibility regarding the most critical aspect of his defense: his state of mind at the time of the crime. Specifically, after the defendant testified at trial that he "lost [his] mind" when the victim threatened to cut his Rastafarian dreadlocks, the prosecutor impeached him with the portion of his suppressed statement indicating that his blackout actually began when the victim started scratching him. The prosecutor highlighted this

State *v.* Haynes

inconsistency in his closing argument, suggesting that
the defendant had conveniently and retroactively con-
cocted a story of extreme emotional disturbance involv-
ing his Rastafarian religion. The prosecutor remarked:
"On . . . direct [examination], he gave one version,
and I apologize [if] it's a little all over the place with
all the different versions. . . . He told you, 'I lost my
mind, lost control of my normal everyday thoughts.'
Sounds a lot like the law. He was positive that [the
threat to his dreadlocks] was what set him off. Positive.
He sat right here, and he told you yesterday, 'I am
positive.' " The prosecutor then compared this with the
defendant's suppressed statement, saying: "In that [tell-
ing] of events, he gave another version. He's lying down
naked, he sat up to defend himself, she yanks [his] hair
out, pulled a couple locks out. No rage. . . . She starts
scratching [his] arms and body, started yelling. This is
when . . . in [the suppressed] statement, he claims
[that] he loses it. When she's scratching his arms, that's
when he starts yelling, 'fire, fire, fire,' whatever that
means. So, now we have a different version of events
as to when he 'lost' it." The prosecutor's focus on this
inconsistency during closing argument could have led
a reasonable jury to doubt the defendant's claim that
he had suffered an extreme emotional disturbance.[24]

The prosecutor also emphasized numerous other
aspects of the tainted evidence during closing argument

---

[24] I observe here, once again, that, despite any inconsistencies, the defen-
dant's statement to the Waterbury police regarding his purported emotional
disturbance did not contradict his testimony at trial. The defendant told the
Waterbury police that, when the victim first threatened to cut his hair, he
told her to stop. He also told the police that, the second time she threatened
to cut his hair, he pushed her on the bed, wrestled her for the scissors, and
blacked out. It was in the midst of this physical altercation that the victim
began scratching the defendant's arms and body. The defendant's statement
suggests that he was disturbed by the victim's threats to cut his dreadlocks
from the start, and his reaction then escalated into a blackout when the
threats continued. Under the rule I propose, this noncontradictory excerpt
from the defendant's suppressed statement would not have been admissible,
even for impeachment purposes. See part II of this opinion.

State *v.* Haynes

before the jury, including some of the more gruesome details. Although none of the details contradicted anything in the defendant's testimony, this effort at impeachment could only have caused the jury to question why he omitted those details from his testimony on direct examination. The prosecutor made sure to remind the jury that the defendant "[t]old [the] police [that] he heard [the victim] gurgle and [that] blood shot everywhere," and that he "[w]atched her arm[s] and her body as they went limp." The impact of highlighting these bloody details was not to inform the jury of the brutality of the crime; the jury would have been well aware of the extensive photographic evidence and an autopsy report documenting the victim's severe injuries. Instead, the impact was to demonstrate that the defendant had omitted some of the most brutal details from his testimony at trial, which could have led a reasonable jury to suspect that he was giving a sanitized version of events. Such a suspicion would have undermined his credibility with regard to his affirmative defense.

In light of the frequency of the violations in the present case—the improper use of more than twenty parts of the suppressed statement in a course of conduct that permeated virtually the entire cross-examination of the defendant—the error cannot be deemed harmless beyond a reasonable doubt. See, e.g., *United States* v. *Cummings*, supra, 858 F.3d 778–79. The prosecutor's repeated use of the inadmissible evidence during closing argument further supports this conclusion. See, e.g., *State* v. *Culbreath*, supra, 340 Conn. 195. The credibility of the defendant's testimony regarding his defense of extreme emotional disturbance was central to the case, and the primary impact of the admission of his illegally obtained statement was to undermine his credibility in a manner not permitted under the exclusionary rule. See part II of this opinion.

State *v.* Haynes

The state contends that, to the extent the admission of the defendant's suppressed statement was improper, the error was harmless because his defense of extreme emotional disturbance was unbelievable in light of the rest of the evidence. The state notes, among other things, that the defendant provided no medical explanation for his extreme emotional disturbance; that he said in an unchallenged statement to the New York City police that he "laughed" at the victim when she pulled out his hair; that his actions fleeing the scene demonstrated an awareness of the wrongfulness of his actions; and that his Facebook messages to the victim's family members on the night of the crime claimed "accident" and "self-defense" rather than extreme emotional disturbance. The state further contends that, even if the jury believed that the defendant acted under the influence of an extreme emotional disturbance, it would not have found that his actions were reasonable under the circumstances as he viewed them.

I have no hesitation acknowledging that the evidence in this case weighed strongly against the defendant. There was no question that he killed the victim and, moreover, that he did so in a vicious, violent manner. His sole defense was that he was suffering from an extreme emotional disturbance at the time of the incident, which he claims was caused by the victim's efforts to forcibly remove his Rastafarian dreadlocks. Other than his own testimony, there was no evidence in the record to support his claim of extreme emotional disturbance. The jury clearly could have concluded on this record that the defendant's testimony regarding his extreme emotional disturbance was not believable and that he killed the victim because he was "just an angry man," as the prosecutor suggested. Alternatively, the jury could have fully credited the defendant's testimony, accepted that he was suffering from an extreme emotional disturbance at the time of the incident, and none-

State *v.* Haynes

theless rejected his defense on the ground that his disturbance was unreasonable under the circumstances. Either way, the probability of the jury's acceptance of the defendant's affirmative defense was not high.

But I cannot say that the outcome was a foregone conclusion. It is axiomatic that "[w]e do not sit as a thirteenth juror" and that consideration of the evidence is firmly within the province of the jury. (Internal quotation marks omitted.) *State* v. *Bush*, 325 Conn. 272, 304, 157 A.3d 586 (2017); see id., 304–305. In the present case, we cannot know how the jury would have found had it not been presented with more than twenty portions of the defendant's suppressed statement, which the prosecutor then emphasized repeatedly in his closing argument. Recall that the defendant was required to prove his affirmative defense only by a preponderance of the evidence. See, e.g., *State* v. *Campbell*, supra, 328 Conn. 510. Moreover, the affirmative defense of extreme emotional disturbance does not require the jury to find that it was reasonable for the defendant to have killed the victim but, rather, that it was reasonable for the defendant to suffer an extreme emotional disturbance under the circumstances, and that the defendant was suffering from such a disturbance when he caused the victim's death. See id. But for the inconsistencies that the prosecutor highlighted in the defendant's suppressed statement, the jury could reasonably have credited the defendant's account of his extreme emotional disturbance and have concluded that there was "a reasonable explanation or excuse" for the disturbance in light of his long-standing Rastafarian religious commitments. (Internal quotation marks omitted.) Id. I consider it realistic, if unlikely, that the improper admission of the defendant's suppressed statement tipped the scale against him in the jury's assessment of his credibility, defeating any chance he might have had to prevail in establishing his affirmative defense before the jury.

It is the state's high burden to establish beyond a reasonable doubt that the improper admission of the defendant's illegally obtained statements, amounting to an evidentiary error of constitutional proportions, "did not contribute to the verdict obtained"; (internal quotation marks omitted) *State* v. *Sayles*, supra, 348 Conn. 682; or have "a tendency to influence the judgment of the jury . . . ." (Internal quotation marks omitted.) *State* v. *Mangual*, supra, 311 Conn. 214. For the foregoing reasons, I do not believe that the state can meet that burden in the present case.

———————————